UNITED STATES v. CORN PRODUCTS REFINING CO. et al.

(District Court, S. D. New York. June 24, 1916.)

1. MONOPOLIES &⇒17(1)—ANTI-TRUST ACT—COMBINATIONS IN RESTRAINT OF TRADE.

· Defendant Corn Products Refining Company, which on its organization in 1906 acquired control of all the glucose plants in the United States and of starch factories producing 64 per cent. of the total production, *held* an illegal combination in restraint of interstate trade, and to monopolize the same, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821), on evidence showing that the purpose of its organization was to prevent competition, and that the power acquired by the combination was exercised to prevent by unfair means new competitors from entering the field, and to drive out those entering or already engaged in the business, through profit-sharing contracts with customers which required them to continue to purchase from it exclusively for more than a year afterward to entitle them to the benefit of the contract in any particular purchase; by a contract with a new

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

competitor, induced by threats of entering into competition in another branch of the competitor's business, by which it obtained one-half the glucose production of the new plant and sold the same at a loss through secret agents purporting to represent independent makers for the purpose of preventing others from entering the business; by the sale of mixed syrups, of which it acquired control of more than half the production, at little or no profit, and at prices which left no profit to independent mixers, who were compelled to buy their glucose in the market; and by other price manipulations and local discriminations, all of which were more or less successful in maintaining its monopoly.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☜17(1).]

2. MONOPOLIES ☜17(2)—ANTI-TRUST ACT—CONTRACTS IN RESTRAINT OF TRADE.

Profit-sharing contracts put in practice by a manufacturer of glucose and grape sugar, which at the time had practically a monopoly, by which 10 cents was set aside for each 100 pounds of product sold to a customer, and paid to him at the end of the following calendar year, provided he had not in the meantime purchased from any other producer, when adopted as part of a general scheme to prevent competition, are contracts in restraint of trade, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (Comp. St. 1913, § 8820).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☜17(2).]

3. MONOPOLIES ☜24(2)—COMBINATIONS IN RESTRAINT OF TRADE—REMEDY.

In considering the question of the dissolution of an illegal combination of manufacturing concerns, which has by the export of the product of one of its plants near the seaboard built up a successful foreign trade, relying on its other plants to supply the domestic market, the court cannot undertake to determine whether the public injury from the loss of such trade, which might result from the severance of such plant, because, if operated independently, its product might be sold in the domestic market, would outweigh the benefit to the public of the increased competition in the home market.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☜24(2).]

4. MONOPOLIES ☜24(2)—COMBINATIONS IN RESTRAINT OF TRADE—REMEDY—DISSOLUTION.

Where an illegal combination of a majority of the plants in the country in a line of manufacture has persistently, through a number of years and in various ways, used the power given by the combination to interfere with the free course of commerce which the law demands, the remedy by injunction alone is inadequate, and to be effective should extend to a decree of dissolution.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☜24(2).]

In Equity. Suit by the United States against the Corn Products Refining Company, the National Starch Company, the St. Louis Syrup & Preserving Company, the Novelty Candy Company, Penick & Ford, Limited, Edward T. Bedford, William J. Matheson, Frederick T. Bedford, Frederick T. Fisher, C. H. Kelsey, A. B. Boardman, George S. Mahana, George M. Moffett, William H. Nichols, Jr., A. A. Smith, James Speyer, E. Beverly Walden, C. M. Warner, Thomas P. Kingsford, R. S. Burns, F. A. Lohmeyer, Benjamin Schneewind, C. W. Lohmeyer, Edward T. Bedford, 2d, A. N. Watkins, C. H. Lorenz, Louis Suss, William S. Penick, Jr., and James P. Ford. On final hearing. Decree for complainant.

This is a petition under the Sherman Act by the United States for an injunction and a dissolution of the defendant Corn Products Refining Company, because of a monopolization and a restraint of interstate and foreign commerce, and because of a conspiracy to monopolize and restrain such commerce, in the manufacture and sale of starch, glucose, grape sugar, and in the mixing of glucose with the refiners' syrup, molasses, or other syrups. The individual defendants are the officers and directors of the defendant Corn Products Refining Company and of the corporate defendants, National Starch Company, St. Louis Syrup & Preserving Company, and Novelty Candy Company. There are also joined in the petition the president and directors of a Louisiana corporation, Penick & Ford, Limited, and the corporation itself. The petition sets forth that the principal products derived from corn are: (1) Starch for food and laundry purposes; (2) glucose or corn syrup; (3) grape sugar or corn sugar. It then sets forth the history of the defendant corporations from the year 1897, alleging the combinations from which by a series of reorganizations the defendant Corn Products Refining Company arose in 1906 and the National Starch Company in 1900, and the subsequent acquisition by the Corn Products Refining Company of the stock in the St. Louis Syrup & Preserving Company and Penick & Ford, Limited. It then asserts that the Corn Products Refining Company and the National Starch Company grind 66 per cent. of the entire production of starch and glucose in the United States, and by means of the control so created, monopolize, and attempt to monopolize, interstate and foreign commerce in starch, glucose, and other corn products; that they control likewise 80 per cent. of such commerce in mixed syrups, as so defined. It then alleges ten sorts of unfair trade practices by the defendants, as follows:

(a) By means of the combinations before set forth.

(b) By means of the dismantling and sale of certain of its plants which had been acquired in excess of their real value.

(c) By means of contracts secured from officers of the corporations consolidated agreeing not to enter into manufacture within 1,500 miles of Chicago for stated periods of time.

(d) By means of profit-sharing agreements until the year 1910.

(e) By means of a guaranty in all sales of its goods against the decline in price.

(f) By means of an agreement with the American Maize Products Company by which certain of its glucose purchased by Corn Products Refining Company should be sold at low prices under the guise of sales by independent manufacturers.

(g) By means of threats against the National Candy Company that it would enter into the candy business if the said National Candy Company should enter the glucose business and by the organization of the Novelty Candy Company for that purpose.

(h) By means of fixed prices for the sale of corn products at unreasonably low figures for the purpose of harassing independent manufacturers and by the low price of its own brand of mixed syrup, "Karo," and by driving out the private brands of other individuals.

(i) By means of fixing retail prices.

(j) By means of freight rebates obtained under the cover of allowances for switching service.

The petition prays that the defendants (1) be declared to be combinations in restraint of trade and attempt to monopolize such trade; (2) that the defendants be decreed to have entered into contracts in restraint of interstate and foreign trade and to be engaged in the effort to restrain and destroy trade; (3) that the court adjudge Corn Products Refining Company a combination in restraint of trade and a monopolization thereof; (4) for such other relief as may be necessary.

The answer admits the first three articles of the petition and certain facts in the other articles. It will not be necessary for the decision of the case to particularize these admissions of the answer, as the substance of the proof is considered in the later discussion. The eighth article of the answer on behalf of the individual defendants James Speyer, A. B. Boardman, Clarence H. Kelsey, and W. H. Nichols, Jr., denies any connection with the Corn Products Refining Company except after certain dates therein mentioned.

The petition was filed in March, 1913, the answer on April 9, 1913. The government commenced taking testimony on June 10, 1914. Testimony was taken thereafter out of court until about the end of 1915, after which the case came on for a hearing on January 10, 1916, before Hon. Learned Hand, District Judge, and testimony on both sides was completed. It was thereafter argued in March, 1916. Meanwhile, and on May 14, 1915, an interlocutory decree had been taken by consent effecting a dissolution of the combination, so far as it had gone, of Corn Products Refining Company with Penick & Ford, Limited, by the sale of all securities already purchased, and forbidding the defendant from acquiring any other securities in that corporation, or in any other fashion acquiring any interest or control in it.

The following statement of facts is made for the most part in chronological order, stating separately the conditions of the starch and glucose industries until 1902, at which time they were first combined in the formation of the Corn Products Company. The starch industry before 1902 is taken up in three periods: (1) That prior to 1890, the date of the formation of the National Starch Manufacturing Company; (2) that from 1890 to 1900, the date of the formation of the National Starch Company; (3) the period from 1900 to 1902. The history of the glucose industry is considered in two periods: (1) That prior to 1897, the date of the formation of the Glucose Sugar Refining Company; (2) that from 1897 to 1902. The conditions of the joint industry are then considered in two periods, (1) that from 1902 to 1906, until the formation of Corn Products Refining Company; (2) that from 1906 until the close of the testimony. In the consideration of the period from 1906 to the present time the various practices adopted by the Corn Products Refining Company are themselves considered in chronological order along with the development of the industry itself. At the conclusion of this statement of facts the various allegations of the petition are taken up in the order stated in the petition, and formal findings of fact are made upon all of them. Finally, appears a discussion of the law deemed applicable and of the conclusions of law made by the court, together with such remedies as the facts and the law require.

Jesse C. Adkins, of Washington, D. C., and Van Sinderen Lindsley, of New York City, for the United States.

Morgan J. O'Brien, of New York City, James M. Sheean, of Galena, Ill., and Albert B. Boardman and Preston Davie, both of New York City, for defendants.

## I. THE CONDITION OF THE STARCH INDUSTRY IN 1890.

LEARNED HAND, District Judge (after stating the facts as above). [1] Starch is used for mill, laundry, and food purposes and is sold both in bulk and in packages. Its method of manufacture at the present time is not in substance different from that employed 26 years ago. The raw product is the ordinary Indian maize or corn, which is bought already separated from the husk, and is first soaked or steeped in hot water impregnated with sulphur. The water is left upon the kernel until it is quite soft, when it is run between two plates of rough, coarse teeth, which break it up and disintegrate the germ from the starch proper, after which both germ and starch are run into vats and allowed to rest. The germ, being the lighter part, floats to the top and passes over the lip of the vat into a separate container. The remainder contains the starch proper and the husk, although with the germ has gone off a certain amount of starch, which under improved methods is later reclaimed. The residual emulsion of starch and husk falls into a second grinder, like an ordinary miller's grindstone, where it is ground into a very soft pulp. The husk is separated

from the starch in emulsion by revolving on the inside of silk screens. At the lower end of the screens the husk is carried off. Through the meshes of the silk flows out the true emulsion of starch in liqueous form, which is then poured upon long tables with a very slight slope, on which the starch settles to the bottom and the gluten, an element of the starch, flows off at the end of the table. After the tables have been filled with a solid cake of starch, it is dug out by shovels, pulverized or macerated in a moist condition, and delivered upon tables, whence it goes into racks, which are in turn run into long kilns. The starch is dried in the kilns by the passage of hot air constantly blown through it, until all the moisture has been evaporated. After it is quite hard and dry and brittle, it is broken up as fine as necessary. Powdered starch is what has been ground into fine powder; pearl or mill starch, what has been broken into lumps of considerably greater size. This is the end product of the process and is sold as such. In the manufacture of the package starch, which is used for the most part for edible purposes, the process is the same, except that greater care is exercised to assure the absence of all impurities. There are some variations, also, in the production of "lump starch" and its mechanically produced equivalent, "pressed starch," but these are not important. Certain by-products result from this process which it is not necessary to consider, but which in the later stages of the industry have assumed a very important part in its returns.

In the year 1890 there were 22 or 23 small plants for the manufacture of starch, situated for the most part in the corn belt of the Middle West, except several at Buffalo, one at Oswego, and one at Glen Cove, Long Island. These had a small capacity, ranging from 200 to 1,800 bushels of corn a day, except the Glen Cove Manufacturing Company, which could grind 7,500 bushels. This was the only plant at that time manufacturing both glucose and starch, and had a glucose capacity of 5,000, the rest going into starch. These companies in some instances had been over 65 years in existence; the best-known brands being those of Kingsford at Oswego and of Duryea at Glen Cove, each of which were for edible starches and were of great value. Of these plants, some 20 were combined in 1890 into the National Starch Manufacturing Company, through the active promotion of one Chester W. Chapin, of New York. The National Starch Manufacturing Company was organized with a capital stock of $10,500,000, and a first mortgage 6 per cent. bond issue of $4,500,000, making $15,000,000 in all. Like most combinations of that character, it had been preceded by a very severe competition for a number of years; many of the plants working at less than their full capacity, some being actually in the hands of receivers. Prices had been cut severely, in some cases even below the cost of production. The combination was not effected as a trust, but as a holding company, the National Starch Manufacturing Company acquiring the stock of its constituents. The owners of the companies purchased as part of the consideration generally contracted not to engage in the manufacture of starch or glucose for a period of 5 years.

This combination centered into one control between 75 per cent. and 80 per cent. of the starch business in the United States. Its plants had a capacity of between 230,000,000 and 240,000,000 pounds, and were

producing in 1890 about 200,000,000 pounds of starch yearly. The competition thereafter consisted of the American Starch Company, the Graves Company (the starch plant of the American Glucose Company), Kingsford's Company, and two or three other starch plants, together with starch made by the glucose factories. Shortly after the organization in 1890 a number of the old plants were closed down, for the purpose of economizing, reducing expense, and saving cross freights. There is no certain evidence to indicate that they were closed for the purpose of limiting the total starch production, but it is probable that the total possible production exceeded the capacity of the market at a living profit. This combination was made for the purpose of getting a control of the starch industry, sufficient to fix prices and regulate the supply, and in this way of monopolizing it. By taking in so many outside producers, it was hoped that the preceding competition would disappear.

## II. THE STARCH INDUSTRY BETWEEN 1890 AND 1900.

In August, 1899, the United Starch Company was organized. It included Kingsford's Starch Company, a company at Sioux City, the Graves plant at Buffalo, and the Argo Manufacturing Company of Nebraska. Less than a year later was formed the National Starch Company, in April, 1900, under the promotion of Joy Morton, by a combination of practically all the stock of the National Starch Manufacturing Company, the United Starch Company, and the United States Glucose Company, which was a holding company for the stock of the United States Sugar Refining Company. The National Starch Company continued an independent existence until the first great combination of the starch and glucose industries of 1902, which was formed for the same reason as the others. Competition before 1900 had again become very severe, and it was hoped that the consolidation would reduce costs and improve profits. The National Starch Company on its formation controlled substantially all the starch manufacture in the United States, except that produced by the glucose manufacturers as an incident to their business. It also was formed for the purpose of monopolizing the starch industry by controlling production and prices, through combining with outside producers, and in this way restraining the competition which the previous 10 years had developed.

## III. THE GLUCOSE INDUSTRY IN 1897.

Glucose is made by taking the starch emulsion as it comes from the table and mixing with it a small percentage of acid in a large bulk of water, the whole being violently agitated. The acid has the property of combining the molecules of the starch and the molecules of the water into molecules of glucose. After the agitation is completed the emulsion is allowed to flow down into a converter under heat and pressure, and after a proper period an alkali, such as soda ash, is added, which combines with the added acid and produces a common salt. The next process is to strain off the salt and impurities in a bone-ash filter, after which the glucose is reduced to proper density for transportation, usually 42° Baumé scale. Grape sugar is solid glucose, ex-

cept that, owing to a detail in the process of manufacture, it takes on a thick, brownish-yellow viscous appearance, while the glucose is a pellucid fluid. The grape sugar is poured off into open pans and allowed to crystallize in the air, like any other sugar, after which it is broken up into lumps. Glucose is used by syrup mixers and confectioners; grape sugar is used in the brewing and tanning trades.

In 1897 there were seven glucose manufacturers in the United States, counting as one the two factories of Charles Pope Glucose Company at Venice and Geneva, Ill. Of these the earliest incorporated was the Peoria Grape Sugar Company in 1879. During the period from 1885 until 1890 pools had been established between these companies; there being no division of territory, but each member of the pool being obliged to pay a penalty in case he sold more than his allotted percentage. In November, 1890, the pools either fell by their own weight or were voluntarily abandoned and for 6 years a period of active and severe competition ensued. The largest and most powerful of these companies was the Chicago Sugar Refining Company of Chicago, and the next the American Glucose Company. A combination in the form of a holding company was effected in 1897, which took in all of these companies but the two plants of Charles Pope at Venice and Geneva, and also so much glucose as was made in the plant of the Glen Cove Manufacturing Company, at that time consolidated with the National Starch Manufacturing Company. Pope's total capacity was 16,000 bushels a day, of which, however, about one-third went into starch and two-thirds into glucose. The capitalization of the Glucose Sugar Refining Company was $40,000,000; the daily grind was 100,000 bushels. Like the combination in the starch industry, the stock was heavily watered; but the amount of production remaining outside of the combination was only of trifling amount, so that the control over the industry was even more complete. A certain portion of the stock was retained for the purpose of acquiring the complete control of the industry by the purchase of the Charles Pope Company, if that should later become feasible. The combination was at one time interrupted through legal proceedings by George F. Harding, a stockholder of the American Glucose Company; but he was eventually bought off after the Supreme Court of Illinois had declared the proposed combination to be illegal. Harding v. American Glucose Co., 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. Rep. 189. This combination was made for the purpose of monopolizing the production of glucose, by controlling the price and supply of the product. Like the starch combinations, it was thought that the integration of all producers would prevent future competition.

### IV. THE GLUCOSE INDUSTRY BETWEEN 1897 AND 1902.

After the formation of the Glucose Sugar Refining Company, the prices rose at once, and there was no competition until the year 1901, except from Charles Pope and the Glen Cove Manufacturing Company, of which the latter was almost negligible on account of its disadvantageous location. In 1901 the Illinois Sugar Refining Company, which had been originally built as a beet-sugar refinery, came into the

market as a glucose manufacturer with a capacity of 13,000 or 14,000 bushels, and in the same year was formed the New York Glucose Company, at Edgewater, N. Y., which commenced operations in 1902 with a capacity of 30,000 bushels. This latter corporation was under the direction of men who had all been active in the Standard Oil Company, as was generally known throughout the industry. It proposed to make both glucose and starch, as did also the Illinois Sugar Refining Company.

In the year 1901, therefore, it became apparent that the existing monopoly of the glucose industry at that time enjoyed by the Glucose Sugar Refining Company, with the exceptions above mentioned, was to be threatened. The National Starch Company likewise was threatened, in addition to the competition already existing from the glucose plants by the new plants already mentioned. These conditions created the combination of 1902, known as the Corn Products Company.

## V. The Corn Products Company from 1902 to 1906.

In February, 1902, the Corn Products Company was organized, with a total capitalization of $80,000,000 of stock. It, too, was a holding company, like its predecessors, and acquired practically all the stock of the Glucose Sugar Refining Company, the National Starch Company, the Illinois Sugar Refining Company, the Charles Pope Glucose Company, and 49 per cent. of the New York Glucose Company. It is not now denied that in its organization the corporation was grossly overcapitalized, and that it was a typical instance of the kind of financing which was common in the year 1902, in which it is no exaggeration to say that no attention was paid to the actual value of the properties included. As taken from its stocklisting statement, the total grind of the Glucose Sugar Refining Company at that time was 105,000 bushels, of the National Starch Company 43,000 bushels, of the Illinois Sugar Refining Company 15,000 bushels, and of the Pope Company 15,000 bushels. The capacity of the New York Glucose plant, which at that time had not actually begun operations, was between 20,000 and 30,-000 bushels. The total capacity, therefore, of all the plants combined into the Corn Products Company, was between 200,000 and 210,000 bushels a day. So far as can be ascertained, every starch or glucose plant throughout the country was taken into the combination, which therefore exercised a complete monopoly, so far as combination could secure it, and this was, of course, its purpose. Restrictive covenants were executed by Pope and by the chief owner of the Illinois Sugar Refining Company and were refused by William F. Piel.

After the formation of the company, Conrad H. Matthiessen, its president, manipulated the prices of glucose and starch quite independently of the price of corn, alternately raising and lowering it as the immediate occasion seemed to require. At the outset prices were at once raised and for a portion of the year 1902 maintained. Shortly thereafter, however, friction developed between the Corn Products Company and the New York Glucose Company, of which E. T. Bedford was the president. In March, 1903, a year after the combination, the relations of the two corporations had become strained, and Bedford

resigned as director of the Corn Products Company. Meanwhile, and in 1903–1904, as the result of the combination in question, other plants began to appear. One of these was that of J. C. Hubinger Bros., of Keokuk; the second was a new starch plant erected by Piel, in Indianapolis; a third that of Douglas & Co., at Cedar Rapids; a fourth, the Union Starch & Refining Company, at Edinburg, Ill.; a fifth, the Keever Starch Company, of Columbus; and a sixth, the Huron Milling Company, of Harbor Beach, Mich. All of these were small companies, many of them engaged in the manufacture of what are known as specialties, and none of them of much consequence so far as concerns the control of the industry. The high prices and the combination, however, attracted larger companies into the field. In 1904 Winterman, a syrup mixer, of Granite City, Ill., built a glucose plant of 12,000 bushels at that city. In the same year the Warner Sugar Refining Company, at Waukegan, Ill., reconstructed its own factory, which had formerly been discontinued, and started with a glucose capacity of 18,000 bushels, which in 1905 was increased to 25,000. This factory made all the products arising from the process of wet milling. The Goyer-Alliance Refining Company attempted the erection of a plant of 10,000 bushels in 1905 at Bell-Alliance, La., but owing to an outbreak of yellow fever this was discontinued and failed. A small Cereal Sugar Company also was organized at Waukegan and subsequently bought over by Warner.

The competition developed during the years 1904–1905 and became very bitter. The Corn Products Company, with a number of antiquated plants, was in no proper position to pay dividends upon its grossly watered capitalization, although it actually continued to do so. As a result its plants ran down in manufacturing efficiency, and its stockholders threatened suit. The more powerful competing companies were not so much affected by the combination, as they were more modern and of a higher manufacturing efficiency, especially the New York Glucose Company, which was at that time the model plant in the country. All producers, however, decided that competition was ruinous, and that the time had come for another combination in order to preserve them from its effects. From this resulted the formation of the defendant Corn Products Refining Company, which purchased practically all the stock of the Corn Products Company, of the Warner Sugar Refining Company, and of the St. Louis Syrup & Preserving Company, the outstanding 51 per cent. of the stock of the New York Glucose Company, and the majority of the stock of the small Cereal Sugar Company. The companies so purchased, exclusive of Corn Products Company, were at that time jointly doing about 50 per cent. of the entire domestic and export business of the glucose and starch industry.

## VI. FORMATION OF THE CORN PRODUCTS REFINING COMPANY IN 1906.

In its origin, the defendant Corn Products Refining Company was a holding company, with a capitalization of $80,000,000 of stock, of which about $75,000,000 was issued. This involved the scaling down of the capitalization of the Corn Products Company, which was ac-

complished by compelling the stockholders to take two shares in the new company for three in the old. The stock of the New York Glucose Company, $1,275,000, was exchanged for $5,000,000 of preferred stock and $4,000,000 of common. The purchase of the St. Louis Syrup & Preserving Company and Warner Sugar Refining Company was accomplished in part by cash. The total grinding capacity so consolidated, by the statement of the Corn Products Refining Company itself, amounted to 235,500 bushels. There were left outstanding at the time of the consolidation no glucose manufactories in the United States, though a very substantial starch capacity; for example, in the year 1906 the defendant Corn Products Refining Company did 100 per cent. of the glucose manufacturing, and only about 64 per cent. of the starch.

There were six companies altogether left out of the combination, of which the largest were the Piel and the Douglas companies; but the aggregate grind of these six outside companies together was only 3,384,961 bushels, all of which went into starch. On the basis of grind the Corn Products Refining Company had about 91 per cent. of the total production; on the basis of starch, as just said, only about 64 per cent. Restrictive covenants were procured from the Warners for a period of 10 years and from the Wintermans of the St. Louis Syrup & Preserving Company. Some of the old covenants of the Corn Products Company still remained outstanding and came to the Corn Products Refining Company as part of its assets.

### 1. Causes of the Combination.

This combination of 1906 was caused primarily by the character of the competition theretofore existing under which such low prices had been reached. The income of the Corn Products Company during 1905 had fallen to less than $500,000, and much of its plant had been allowed through several years to fall into a dilapidated condition. This condition had no doubt largely arisen from the improper declaration of the dividends, most of which ought to have been put back into the property to keep it in condition. Indeed, there is no reason to suppose that, during the period of the existence of the Corn Products Company, its actual earnings were not an ample profit upon the actual value of the property, and although the trade war had very seriously affected the New York Glucose Company and the other companies taken in at that time, their earnings also had been substantial.

### 2. Condition of the Plants Taken Over in 1906.

Of all the plants taken over in 1906, only eight had been operated during the previous year. I think it must be assumed that these constituted the heart of the enterprise. Many of the Corn Products Company's plants had become antiquated and inefficient relatively to a contemporaneous construction. Edgewater and Granite City had been independent, and with Pekin were at the time all new plants, and the first two were in high efficiency. It is doubtful whether Pekin, which had been built as a beet-sugar plant, was ever well arranged. Chicago, which was a great producing plant, was certainly in its last stages, and was wisely abandoned within two years. Warner's Waukegan plant

had been independent, and was also a modern plant of high efficiency, though probably a little run down. Of the starch plants proper the best were Oswego, Indianapolis, and the United States Sugar Refining Company's Waukegan plant, all of which were in tolerable condition. Besides these, the Corn Products Refining Company had inherited a number of starch plants which had been closed by the Corn Products Company, many of them plants of the old National Starch Company, which were confessedly in the most deplorable condition. Possibly in many cases these had been closed by the Corn Products Company to avoid overproduction, yet it must be admitted that in the year 1905, when the competition was severest, no effort was made to open them. My conclusion is that those closed down were not, either by their size, their situation, or their physical equipment and structure, capable of effective production. To have made them so would have been to increase a production already greater in volume than the market would bear, and would have stolen from dividends, which for ulterior reasons the Corn Products Company wished to maintain. I believe that these plants, while, as I have said, they were originally combined in an effort through monopoly to control the market, were not closed down by the Corn Products Company in order to keep the price above the fair cost of production.

VII. Control of the Glucose and Starch Trade by the Corn Products Refining Company.

Since 1906 the proportion of the industry based upon total grind controlled by the Corn Products, Refining Company has fallen, in whatever method that may be calculated, and both absolutely and relatively the portion of the industry done by the independents has increased. Three new companies have come into the field—the first, A. E. Staley Manufacturing Company, of Decatur, began to grind only in the year 1912; the second, the Clinton Sugar Refining Company, began in 1907; and the third, the American Maize Products Company, in 1908. The total aggregate of grind of the nine independent companies existing on December 31, 1913, had risen from about 3,000,000 to 17,500,000 bushels, and the total grind of the Corn Products Refining Company during that year was a trifle less than in the year 1906. The proportions for 1913 are, Corn Products Refining Company 65 per cent., independents 35 per cent., and with one exception the decrease in proportion has been constant. The actual grind of Corn Products Refining Company has remained not far from constant, varying between 35,000,000 in 1910 and 26,000,000 in 1908. In 1913 it was substantially the same as in 1906. 1914 is an unsafe year upon which to base any estimate in absolute quantities, as the Great War occurred. I have, however, occasionally used the percentages.

The proportion of this grind distributed to glucose and grape sugar shows a greater change during the period in question than the grind itself. There is a steady decline in the percentage of total glucose production, domestic and foreign, attributable to the defendant Corn Products Refining Company, until in the year 1913 the total percentage is only 57 per cent. and in 1914 53 per cent. The change in the percentage of grape sugar production is not great; in 1914 it was still over

90 per cent. of the whole. Of starch, in 1906 the defendants' percentage was about 64, and actually increased to more than 70 per cent. in the years 1907, 1910, and 1911. In 1912 it fell to 67 per cent., and in 1913 to 63 per cent., so that the net change for 8 years was practically nil. However, in 1914 it fell to about 58 per cent. I think it a fair inference from the tables that the percentage of production of the Corn Products Refining Company is on the whole surely, but certainly, decreasing, due to the absolute increase in the grind of its competitors and its own inability permanently to increase very substantially its own grind. It would be obviously futile to attempt any forecast of the industry.

The defendants urge that in considering their control of the industry there should be included in total production, not only the starch or glucose production, but also those substances with which the starch and glucose come into competition in their end products. Thus they say that the pearl and powdered starch come into competition with the grits of the dry-corn millers in the brewing trade, and that the dextrines and gums come into competition with those made from other substances than corn. They say that in the mill trade the corn starch comes into competition with sago, tapioca, potato, and wheat starches; that the syrups made from 85 per cent. to 90 per cent. glucose come in competition with those made with much less; that candy contains all sorts of percentages of glucose. So, they argue, the whole of these industries must be considered, in order to get any fair estimate of the amount of the control exercised by the Corn Products Refining Company.

This argument may best be met by an illustration for which I will take as an instance one much pressed by the defendants; i. e., that of the competition of the pearl starch, under the name, "refined grits," with the dry millers' similar article, "brewers' grits." What the brewer, the buyer, wants is maltose, and he will buy it indifferently from the wet or dry miller as he gets more maltose for his money. The production of maltose is, however, by a different process in the one case from the other, and the proportion of maltose is as 90 to 73 in favor of "refined grits." So long as the cost of production per unit of maltose favors the "refined grits," a producer who controls its means of production has a monopoly limited only by the amount of that differential. It is quite true that, if for any reason the monopolist of the cheaper material raises the price to that of the dearer, he will at once meet with the competition of the sources of supply so thrown open by his advance. Thereafter he cannot be properly called a monopolist, unless the supply thus opened is so insubstantial as not to affect the market. In short, his monopoly, where the two commodities compared are indistinguishable in use, is limited by the actual differential in the cost of production between them. Such a monopoly is therefore only a limited one, but within the limits it may be a true one.

There is no very definite evidence of the relative cost of production of "refined grits" and "brewers' grits," but in Bedford's testimony he speaks of the dry millers' cheaper production and cheaper construction, and how at times it drove them to sell below cost. If the dry process was cheaper per unit of maltose than the wet process, obvi-

ously the dry process only would hold the market, unless the dry millers added to their profit all the differential in cost of production. If they did that, the wet millers would come into competition with them. If not, the wet millers' competition must be only sporadic, or to force a demand in the hope of establishing a market and in the end lowering cost.

The relevancy of all this is only as follows:. If the wet process is cheaper than the dry, then, although a monopoly of the wet will be limited by the dry, it is improper to consider the production of the dry millers, when ascertaining the proportion of production controlled by a supposed monopolist of wet milling. If, on the other hand, the dry process is cheaper than the wet, and if, which would be hardly possible, a sustained competition between them existed, then one could not disregard the dry production for all purposes. In that case one ought to eliminate from the supposed monopolist's production that part of the grind which went to "refined grits," but that would be the only correction necessary. The rest of the grind would not come into competition with the brewers' grits or with the dry millers' upon the same conditions; i. e., indistinguishability in use and less cost of production.

The evidence contains nothing which would permit the application of any such refinement of reasoning. I have elaborated upon it, not because I think it has any practical bearing upon this case, but for the sake of analyzing the contention of the defendants that all the products which they vaguely say come into competition with them must be considered. This is certainly far from true; it is only true under those very limited conditions above set forth. In the case of the sago, potato, corn, and wheat starches it is not true at all, because those have both a distinguishable use value and a higher cost of production. The most that can be said of them is that they do afford a substantial limit upon the wet millers' price, because they would come in if it got high enough. Like any other monopoly, even a legal one, there is a limit of price at which substitutes will displace the cheaper commodity.

When we come to the syrups and the candies, the distinction is even more plain. Syrup with 90 per cent. or 85 per cent. glucose is a different article from that with 40 per cent. So is candy. If either is honestly sold, the purchaser will know the difference. He does not buy, like the brewer, to get a percentage of maltose; he buys the whole mixture as he likes it. If the public at large prefers low-glucose syrups, which in most parts of the country are dearer, the high-glucose syrup mixer's profit will be limited by that difference in selling price which will offset the preference in taste. That will always be a limit depending upon the palate of the public, but within that limit the question of monopoly must be considered, without regard to the production of lower percentage syrups. On the other hand, where the cane syrups are cheaper, as is said to be the case in the South, there the wet miller, to sell at all, must find or create a preference for glucose syrup over cane syrup. His margin of profit, and with it the only room for monopoly, will be within such compass as the consumer's preference will tolerate a difference in price.

The tables prepared by the government must therefore be accepted

implicitly with the foregoing limitations. As such they are reliable to ascertain the proportion of the defendants' production to the whole, and I have used them as such. It is proper to make one table for both foreign and domestic commerce, since it rests in the will of the producer to sell in either market. Indeed, this interchangeability of the markets is the implied basis of one of the strongest arguments made by the defendants to oppose dissolution, as will later appear. It is also proper to include the specialties, so called, such as grape sugar, dextrines, thin-boiling and package starches and syrups. These are end products out of a raw material controlled by the wet millers, taken as an industry. What they choose to put into specialties, what they choose to sell as bulk, rests with them, and them only.

It is possible, of course, to have subindustries—syrup mixing is one of these—in which the end process is not wholly in the hands of the wet millers. This subindustry may, however, be treated as separate, and the proportion of it in the defendants' hands compared with the total bulk. That should not be confused with the question of the control of the raw material itself.

It may, perhaps, be questioned whether control of an industry would not be better gauged by the relative producing efficiency of the combination and the independents. If that were done, however, there would have to be figured in some coefficient of efficiency for each, which would be impracticable. The proportion of actual production really shows the resultant of those two factors as well as anything can which is not fanciful. I have, it is true, considered the total producing capacity of Corn Products Refining Company later, but that is for the limited purpose of showing its power to drive down prices. I do not regard that capacity as an index of its permanent occupation of the field; rather I regard it as an index of the capacity for that kind of trade warfare in which Corn Products Refining Company was so much engaged.

VIII. Efforts of the Corn Products Refining Company to Maintain Their Original Monopoly of the Industry.

As already appears, the combination of 1906 was avowedly for the purpose of terminating a competition theretofore existing. The industry had already experienced at least three such situations before, in 1890, 1897, and 1902, and in each case a combination had been effected for the same purpose—to prevent what the parties called a destructive and unfair competition. The fact in each case seems to have been that the industry had developed a supply greater than the market would absorb at any prices which permitted a living profit, and whether or no they may have deliberately contemplated a termination of that overproduction it was a necessary and inevitable result that this should take place, because it was the only means by which the conditions could be avoided which all sought to avoid. After the combination had been completed, those plants were closed which were the feeblest economically—the Chicago and the two Waukegan plants—and the remaining were either refitted altogether

or brought to a higher efficiency; but, as I shall show later, I do not think that the purpose in either case was to limit production.

The combination of 1906 would certainly have continued effective to monopolize the trade, had it not been for the growth of the independents already mentioned in the heading just preceding. Yet the Corn Products Refining Company was the first in the field, and for a period of a year or more it had that field alone. The contention of the government, which I think is amply proven by a variety of considerations which I will afterwards discuss, is that the officers of the Corn Products Refining Company made every effort to maintain the monopoly with which they started; and the contention of the defendants, which it seems to me is equally well proved, is that, regardless of what their efforts may have been, in fact the conditions of the industry were such that they could not do so, but have been slipping back proportionately from the very outset.

In the following subheadings, the devices adopted by the defendants to continue the control are taken up seriatim, but at the outset it will be clearer to comment upon a certain part of the evidence which is unusual. Ordinarily the intent, which plays so large a part in the decisions of the court in cases of this sort, must be gathered alone from the conduct of the defendants themselves; but in this case, by an unusual chance, the evidence goes much further. The officers of the Corn Products Refining Company apparently had a custom of communicating with each other by typewritten, unsigned memoranda. Apparently it was often difficult for them to interview each other personally, and the affairs of the company were discussed between them by means of these memoranda with the utmost frankness. The documents were never intended to meet the eyes of any one but the officers themselves, and were, as it were, cinematographic photographs of their purposes at the time when they were written. They have, therefore, the highest validity as evidence of intention, and, although in many instances Bedford attempted to contradict them, his contradiction only served to affect the general credibility of his testimony. In the face of these memoranda, which for some strange reason were preserved, there can be no question in my mind of the continuous and deliberate purpose of the Corn Products Refining Company, by every device which their ingenuity could discover, to maintain as completely as possible their original domination of the industry. That they recognized the impossibility of an absolute exclusion of other glucose and starch manufacturers is true enough, for they were minutely advised as to all conditions of the industry. But, while recognizing this inability, they in no wise conceded among themselves that their conduct could not have, and should not have, a depressing influence upon the growth of any competition. In considering the various devices adopted for that purpose, I shall paraphrase the memoranda in detail; but at the outset it is important to remember that permeating the whole of their conduct, certainly down to the year 1912, there runs the intent which I have mentioned, an intent the execution of which it is the precise purpose of the anti-trust act to foil.

## 1. The Profit-Sharing Plan.

[2] On November 12, 1906, after the combination had been some 8 months in existence, the defendants announced their so-called "profit-sharing plan." This applied only to glucose and grape sugar, in which, as already appears, the defendants' monopoly was at that time most nearly absolute. They agreed to set aside out of the profits from the sale of glucose and grape sugar 10 cents on each 100 pounds (with some exceptions) purchased by a consumer from July 1 to December 31, 1906. This amount was, however, not to be paid to the consumer until the end of the year 1907, and then was to be payable only in case the customer had purchased glucose and grape sugar of no other producer than itself. This policy was continued through 1906, 1907, 1908, and 1909, and was abandoned at the end of the year 1909; the profits for that year, however, not becoming due until the end of the year 1910. The profit varied, beginning at 10 cents, and afterwards varying between 15 and 5 cents; the last figure, however, being announced only. That such a contract was not inherently illegal is undoubtedly the fact, for it was so expressly decided by the Supreme Court in the case of Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U. S. 165, 35 Sup. Ct. 398, 59 L. Ed. 520, Ann. Cas. 1916A, 118. But there is no warrant in the opinion for supposing that it was a permissible method of trade when a part of a general scheme of monopolization. That is the question which this case presents.

The National Candy Company was about to start its glucose plant at Clinton, and, in fact, got it under way in April, 1907. It was the first glucose company outside of the combination which showed its head. The Western Glucose Company was organized in 1906 at Roby, Ind., likewise for the purpose of competition in glucose. In fact, it, too, did not get under way until 1908, owing to the panic of 1907; but the enterprise was known to Bedford during the year 1906. The Union Starch & Refining Company, a small corporation organized before 1906, began to put in a glucose plant early in 1906 and started running in December of that year. There was, therefore, known competition springing up in the glucose business, and it was quite obvious that, if large sales could be made during the year 1906 or the early part of 1907, before the new plants began to sell, the accrued profits might be a substantial way of hampering these at the outset. That this was in fact the purpose of the defendants admits of no conceivable doubt. Smith, a director, writes to Bedford on April 10, 1907, that "the profit-sharing plan is the best scheme ever devised in the way of limiting the output of competitors and making it difficult for them to sell." He adds that if they were to have a war it should be to the finish. Walden, on April 27, 1908, writes to his brokers, Johnson and others, that if they lost a customer the competitor must pay for him what the defendants would have had to pay (in profits) to retain him. The purpose of the parties is particularly indicated in the correspondence early in July of 1909, when they were actively discussing the value

of the device, and the wisdom of continuing it after that year. Bedford, on July 9, 1909, wrote to his son that the profit-sharing was a wall the competitors felt that they could not get over; that without it they would have made very much more money and would have been much larger manufacturers than they were at that time; that some of them had said the Corn Products Refining Company had built a Chinese wall against competitors and kept them in chains. On the same day he wrote again to his son that the scheme created expenses and difficulties to the seller of glucose that the starch manufacturer did not have.

Bedford's own testimony on the trial was that the purpose of the plan was only to prevent small manufacturers in dull seasons from selling the defendants' own regular customers and offering his surplus to other customers at a trifle under the regular price. In view of the expressions in the memoranda, this understanding of the plan must be rejected.

The plan undoubtedly had a deterrent effect upon the trade and was thought by many competitors to be unfair. Peckham, the president of the Clinton Company, swore that, had he known it, he would not have gone into the business. Hughes, the vice president of the Union Starch & Refining Company, found the trade tied up and hard to get business from. The American Maize Products Company, the successor to the Western Glucose Company, which began to do business about May, 1908, was much hampered by it. Edinburg swears that in July, 1909, the plan made it difficult for competitors to get business. Numerous customers were likewise called, who swore that the plan kept them from buying from independents.

## 2. The Transaction with the American Maize Products Company and Stein, Hirsh & Co.

As already stated, the Western Glucose Company had begun to erect a plant in July, 1906, but for financial reasons was compelled to stop until it was taken over in February, 1908, by the Royal Baking Powder Company, and its name changed to the American Maize Products Company. The contention of the government is that by the threat of entering into the baking powder business the Corn Products Refining Company first contracted under a false name, "J. B. Esh," to buy one-half the grind of the new company, of which one-half it sold the part that came as glucose at ruinous prices to break down competition, through Stein, Hirsh & Co.; and, second, that as soon as the new company got well under way the combination compelled a reduction of its grind to one-half its full amount. The defendants deny any threat or agreement to limit the grind, but admit that they bought half of the glucose output of the American Maize Products Company, which they needed in order to supply their trade for the time being. Bedford's account is that just then the Chicago plant had been dismantled, as was the fact, and that it was necessary to supply a sufficient amount of glucose and starch to take the place of its production. The pure food laws had just gone into effect, which made it illegal to add a preservative to the glucose, and

Bedford says that he soon found the glucose of the American Maize Products Company was inferior in quality. As he must dispose of it in some way, and could not have two prices for glucose, he was obliged to sell through Stein, Hirsh & Co. secretly.

The evidence shows that originally Bedford attempted to buy the Western Glucose Company, but that was before 1908. The purchase of that company by the Royal Baking Powder Company took place under conditions of great secrecy in the spring of 1908. On March 17, 1908, Bedford's son wrote the traffic manager of the Corn Products Refining Company that they had decided to put up a baking powder plant at Oswego. Bedford says that they had discussed the making of baking powder as early as 1906, and had had some labels printed; but the coincidence in time of their actual decision to enter this trade, in the light of the other evidence, is significant.

The sales by American Maize Products Company to the Corn Products Refining Company began on May 26, 1908, and ended on December 30, 1909. The total capacity of the company was about 325,000 bushels a month, which was reached in March, 1909, about 10 months after the "J. B. Esh" account appears. At that time, although the company had orders for all that it could grind, the grind was at once cut to substantially one-half its volume, at the direction of Vernon Gray, the assistant treasurer of the American Maize Products Company, to Saenger, who at that time was the manager. The cut continued through the summer of 1909. "J. B. Esh," the fictitious name in which the account was carried, was concededly a cover for the Corn Products Refining Company, whose identity was kept even from the high employés of the company, and in August, 1908, the account was credited with $600 for machinery, at the personal direction of Boselly, the president. The credit implies the sale of $600 of machinery by the Corn Products Refining Company to the Royal Baking Powder Company, and in my judgment offers strong corroboration of the assertion that the baking powder venture had been in fact a threat. That this machinery was for manufacturing baking powder is matter of inference, which I do not hesitate to make.

The starch bought by J. B. Esh was delivered to the Corn Products Refining Company, but the glucose was all sold secretly through a firm of brokers, Stein, Hirsh & Co. These brokers refused to give to customers the source of the glucose, except to say that they had large factories, situated vaguely in the corn belt. F. T. Bedford directed them with care not to sell to Corn Products Refining Company customers, and their sales were much below the market price, sometimes as much as 30 cents. The defendants repeatedly denied their connection with the sales which had excited the suspicions of the trade. Thus Walden wrote to Gibbs on May 15, 1908, not only denying the sales, but suggesting that the competitors of Corn Products Refining Company were themselves selling under cover. F. T. Bedford wrote Smith on May 25, 1908, advising him that he might say the sales came from "independent manufacturers." Bedford asserted that the glucose was of inferior quality; but, except for his testimony, which I cannot accept, I can find no such evidence. No complaint appears to have been made to the brokers themselves.

The attempted explanation of these unquestioned facts is discredited for many reasons. First, the arrangement with Stein, Hirsh & Co. was made before May 26, 1908, the date of the first delivery to "J. B. Esh." The letters of May 15, 1908, from Walden to Gibbs, of Creel to Smith of May 18, 1909, and of F. T. Bedford to Smith of May 25, 1908, all speak of Stein, Hirsh & Co. At that time Bedford, by his own statement, was buying in good faith and expected glucose of prime quality; it was only after the deliveries were made that it became necessary for him to employ Stein, Hirsh & Co. The position absolutely contradicts the documentary facts. Second, upon finding the glucose bad, Bedford had it in his power, so far as appears, to direct his demand upon starch, because of the flexibility of the American Maize Products Company plant, which out of a total grind of 12,000 bushels could make 10,000 in starch. Yet he bought only about 40 per cent. of the actual starch output of the plant, and 60 per cent. of the glucose. Not only did he, therefore, make no effort to avail himself of the flexibility of the plant, but he did not even do his best with the proportion, as it existed. Yet he swears that he was always anxious to get all the starch that he could. Third, it is quite evident from the later letters what the device had been. In his letter of July 8, 1909, F. T. Bedford, in writing Reichmann about the proposed appointment of another selling agent, said that he would remember the trouble they had had with this (method) and the suspicion and feeling it had engendered. In his letter of even date to his father he is even more explicit. After showing that a lower sale price by competitors did not necessarily mean a lower net price, he adds that it had cost them money and created a good deal of feeling to put in a third party to sell glucose for them, in the effort to make the competitors pay as much to customers as the company did. Bedford conceded that the reference was to Stein, Hirsh & Co., and with that concession there is left no room for ambiguity.

The reasonable conclusion from the whole testimony is this: That the agreement between the American Maize Products Company and the Corn Products Refining Company was for the purpose of limiting the competition of the former—first, by obtaining half its starch and glucose output and selling the glucose secretly in competition only with the independents to injure their business; and, second, by procuring an actual limitation of the grind when the business became too large. The whole device was that known as the "bogus independent"; i. e., a false independent organized for the purpose of fraudulently breaking the market of the actual independents, by selling under conditions with which they cannot compete. It was a means of secret price discrimination.

### 3. Defendants' Entry into the Candy Business.

#### (A) Manierre-Yoe.

As already stated, the Clinton Sugar Refining Company, a subsidiary of the National Candy Company, began grinding corn in April, 1907. The original capacity of the plant was 5,000 bushels, of which the National Candy Company itself consumed about one-third. In 1906 Bedford had an interview with Kersting, the gen-

eral manager of the Clinton Company, and told him that he was violating his old contract with Warner, which forbade his entering the business. Walden met Peckham, the president, in that year, and suggested that his plan for reconstruction might yet be stopped before completion.

These preliminaries did not stop the erection of the plant, and in the autumn of 1907 the Corn Products Refining Company bought out an old syrup company called the Manierre-Yoe Syrup Company, which had been in existence since 1898. Manierre, the president of the company, who certainly was bought out under pressure, at the request of the Corn Products Refining Company remained as president and agreed not to mention the fact that the business had been sold to them. In 1908 the Manierre-Yoe Syrup Company began for the first time to manufacture certain grades of candy, such as gum-drops, made largely of glucose. The identity of the purchaser becoming suspected, there was in February of 1909 an interview at which were present Bedford, Hoops, and Peckham, the president of the National Candy Company. At this interview nothing definite was settled, but each party assumed a somewhat threatening posture toward the other, and later another meeting took place between Bedford, Walden, and Peckham. At that time Bedford said that Peckham had promised not to increase his plant, to which Peckham answered that, while he had said this, yet, if the Corn Products Refining Company went into the candy business, he would increase his own glucose plant. Bedford answered falsely that he was not in the candy business, though he had long since bought and was using the Manierre-Yoe Company as a "fighting proposition." Before this meeting Bedford had asked Hoops, who arranged the interview, to induce Peckham not to increase his own grind, and Peckham had told Hoops his terms as he repeated them to Bedford.

Meanwhile the Corn Products Refining Company was using its ownership of the Manierre-Yoe Syrup Company secretly to compete at cost or less; the proof is to be found in the correspondence. On May 26, 1908, Bedford wrote Smith that the gum-drops which were being put out by the Manierre-Yoe Company should be sold at cost, since they were a "fighting proposition"—a direction which F. T. Bedford and Smith proceeded to put into execution. On May 4, 1909, Morton wrote to Bedford that they should go into the candy business to regulate prices sufficiently to deter ambitious candy manufacturers from engaging in the glucose business; that this would be the best protection to the Corn Products Refining Company; that they could meet this competition better on candy than on confectioner's glucose; and that, unless the Clinton factory was disposed to go out of business and close up, he would be in favor of going into the candy traffic and staying there. This letter was certainly written to be shown to Hoops, and was in fact sent by Hoops to the National Candy Company. The only reasonable explanation is that it was of a piece with the interviews which were going on during the spring of 1909. It can have no other interpretation than a threat, with the purpose of compelling the Clinton Company either to close up its business or to limit its supply. Yet on July 13, 1909,

Bedford wrote Hoops, on receiving a price list of the Manierre-Yoe Company, that it was the first time he had ever seen or heard of it. His letter reads as though the company was one of which he heard by information only, and is a deceitful attempt to make Hoops suppose that he had nothing to do with its competition. Following this letter, Hoops says that Bedford denied that he had any ownership of the Manierre-Yoe Company, when directly challenged. It was impossible for Hoops to put any other interpretation upon the letter without implying that Bedford was deliberately intending to mislead him.

### (B) The Novelty Candy Company.

Bedford called together the candy makers twice in conference, once in July, 1909, and later at Chicago. At each of these meetings Bedford told them that the defendants were losing a part of their trade in glucose, owing to the competition of the Clinton Company, and that he wished them to buy more of him. Otherwise, he said he should be forced himself to go into the candy business.

These conferences apparently did not have the desired result of securing to the Corn Products Refining Company so much of the candy business as they thought should be theirs, and the Novelty Candy Company was purchased in January, 1910, with three old candy plants at Jersey City, Pittsburgh, and Memphis, to which was joined the Manierre-Yoe Company, purchased nearly three years earlier. All of these factories Bedford described at the trial as junk and excused his purchase of them because of the defendants' ignorance of the candy business. It is quite certain that for the years 1910 and 1911 they ran jointly at a loss, and in the year 1912 the loss of the whole Novelty Candy Company amounted to over $100,000, counting the liquidation of the Pittsburgh plant, which caused a loss of $48,000. The Manierre-Yoe Company was generally operated at a profit, and has so continued to the present time. At times the Jersey City plant has shown a profit; but the total candy business had always been at a bookkeeping loss, at least till 1914.

That this loss was due to the low price at which the product was sold many candy makers believed, though, taken alone, their testimony would not be convincing. Some of the manufacturers complained that they were driven out of business; some said they had nothing to complain of. The conclusion of competitors that a competition they have been unable to bear is necessarily below cost is by no means compelling evidence, at least when it is as little unanimous as this, yet the composite of all the proof here leaves little doubt. The method of the defendants' entry into the field, their purchase of useless plants, which they operated at a loss, their avowed cost prices when first operating the Manierre-Yoe Company, and Bedford's confessed policy of selling such products at cost (his letter to F. T. Bedford of March 28, 1910), their double-dealing, their efforts to exclude or restrict the Clinton Company, the covert threats to candy makers, not only at the conferences, but more openly in the Joy Morton letter above quoted, and the last passage of Bedford's letter to Hoops of July 13, 1909—all these together make it so inherently prob-

able that they did put into effect ruinous prices as to justify such a conclusion. Their excuse that they were deceived in the purchase of the Novelty Candy Company overtaxes my credulity. They were experienced men of affairs, in constant touch with the candy trade, well able to go outside for sound advice, if they did not have it within their own numbers. Quite another purpose fits much more easily into the frame, and that purpose I find that they entertained.

## IX. Unreasonable Prices and Manipulation of Prices.

The profit-sharing plan ceased at the end of 1909, although its results necessarily endured for another year, as the consumer could not get its retained profit unless he dealt exclusively with the Corn Products Refining Company during 1910. The position of the government is that by a preconcerted effort the defendants in the years 1910–1911 attempted to drive down the price of the main products, starch and glucose, to such a point that the independents could not live, meanwhile making up the profits necessary for their own dividends by the sale of their package starches, grape sugar, and their other specialties. The defendants assert that the decline in price, which all concede took place in the years 1910–1911, was the result of a fall in the price of corn, and that the prices kept pace with corn, without any deliberate or concerted action on their part, or indeed without any power by them to control prices, had they desired to do so.

### 1. The So-called Low-Price Campaign of 1910 and 1911.

#### (A) Outline of the Plan.

That the defendants contemplated just such a maneuver and supposed themselves capable of carrying it out, their private correspondence abundantly proves. The effort appears first in Walden's letter to Bedford, of July 1, 1909, in which he says that they have capacity to supply all of the glucose trade, and are, in fact, only supplying 60 per cent. What he proposes is to make that portion which they do not control feel the force of their competition, which cannot be done under the profit-sharing plan. This depends chiefly upon the company's ability to produce its products at a minimum, which must be done by an increase of output and an abandonment of the profit-sharing plan. His proposal was that the profit-sharing plan be declared off, and, to quote his lively language, "then open the sluice valves and force our competitors' hands during the most effective season of the year—the fall and winter months. Quick action of this kind would most assuredly deter any of those who now contemplate building glucose factories." Bedford's marginal notes upon this letter are instructive. They are as follows: "Make them sell at a loss." "Yes. By making a loss."

Bedford answered this letter on July 12, saying that the principal object of making a larger profit-sharing is to effect a low price for next year:

"In this letter you say they have 40 per cent. Good—that is the place to make a low price. In this memo you also state that their sales for this year were so low that the price of corn would make them of little or no profit— good. Then, we do not need to make our reduction until next year."

On July 7 Bedford wrote to Walden as an alternative of a contract arrangement with the confectioners that they must consider making their price low, commencing on the 1st of January. His plan was to keep the price fairly good for January until the competitors had conceded 10 cents for profit-sharing, then they were to make competition, and the more the competitors sold at a loss the better the ultimate result for them. On the same day Walden answered Bedford that, if the primary object was to sell during the next year at unprofitable prices, he would begin in the autumn, as more injury could be done than in the first six months after January 1; he would put a ruinous price in force on September 1, which would force the competitors to make a concession on contracts already entered into, "thereby robbing them of the opportunity to obtain profitable deliveries on low-priced corn conditions the balance of the year."

On July 8, F. T. Bedford wrote to his father suggesting 5 cents profit-sharing and a 10-cent profit on 100 pounds, which would make the business done by the competitors unprofitable. Whether the 10 cents profit would pay 5 cents on the preferred stock would depend, says he, entirely upon the profit made on the other products. It was equivalent to not over 4 cents a bushel, and out of the 14,000,000 bushels ground in the glucose would give a return of only $560,000. It would be necessary, therefore, on the 11,000,000 bushels which remained to make a profit considerably more than the profit on glucose. He was certain, however, that 10 cents profit, with 5 cents profit-sharing, would make the business very unprofitable to competitors. As to his father's suggestion that they take it out of this year's earnings, because they would make more this year than next, it was itself a good argument for terminating the profit-sharing now, so as to bring about the low-price condition partially in this year and partially in the next. Bedford answered on July 9, in the letter already quoted, showing how much of an impediment the profit-sharing had been to glucose makers and how good in comparison had been the starch makers' profits which Joy Morton had seen. This memorandum he inclosed to Walden on the same day with a letter, saying that they agreed that any scheme which obliged the customers to sell at much lower prices than their own, as the profit-sharing did, had been a great servant to the company. He was doubtful about changing it at that time, but next year was to be some one's "Waterloo." In another memorandum to Walden, of July 12, 1909, perhaps also in reply to Walden's of July 1, he suggests the possibility of making out of the profits for 1909 a reduction of 10 cents a hundred and so inducing the competitors to commit themselves to their customers, and thereafter to reduce the prices so that their proportion of the business should be very unprofitable:

"If they fail to keep their agreements with the trade, it, of course, would come back to us, and we might get 100 per cent."

In that event the competitors would go to the mixers, and the Corn Products Refining Company would have to make the syrup prices relative to what they sold glucose at. He asks for possible prices at

which to sell syrups so that the glucose price to the mixers would still be low.

Walden answered on the 15th of July, suggesting that after their many talks his conclusion was that the best results would be to set the level of their prices in December and January at such a point as to lure on the competitors toward foolish contracts, by reasonably high prices inducing them to make contracts to such an extent even as to encroach upon their own part of the trade warning the trade to secure from the competitors agreements to guarantee against Corn Products Refining Company prices. "Then," he says, "having got them to secure as much as possible, let the Corn Products Refining Company set in to make it unprofitable to the competitors." Before entering on such a campaign, and to avoid the possibility of their competitors being driven from the confectionery trade to other lines, he would suggest that contracts be entered into with the mixing, tanning, and other trades to secure those. After the time arrived when competitors had contracted practically all they could arrange to handle, then they could open their "sluice valve."

This correspondence was all six months in advance, and prices actually remained high into November. On November 4, 1909, Walden wrote Bedford that the most important thing was the danger of their competitors making contracts for the ensuing year at to-day's high level. Bedford had obviously suggested to him a cut in price of some 50 points in a day against that possibility—a possibility which had been actual in the previous year. He warns Bedford against such a sudden drop in prices. A decline of 10 points a day would be more reasonable; a reduction of 25 or 50 points would shock the trade. He believed that they could prevent any of the competitors from making any profitable contracts for next year, but the prime condition was to prevent them from taking advantage of the present high profits; that to him was a most important item to consider. The price, in fact, began to drop at once. On November 15 it was $1.95; it had dropped 10 cents in the next week, though by January 14 it had risen again. It continued dropping for a whole year until on January 10, 1911, it had reached $1.25, 70 cents less than at the time the letter was written.

In 1910 certain of the correspondence shows that the parties understood they were carrying out the policy outlined in the foregoing. Walden wrote to his brokers on February 19, 1910, that "the policy of Corn Products Refining Company adopted about a month ago was to sell goods for the coming year at a very close margin," by which policy he believed that with their own low cost of manufacture he could force the competitors to "cry quits." It was their intention to adhere strictly to the policy and to produce the result which they were assured would be successful. The buyer who remained in the open market and took advantage of daily conditions would undoubtedly reap the best benefit. The most dangerous kind of contract for a competitor to make was to guarantee against their own prices, for if they made enough, and the Corn Products Refining Company saw fit to drive the price down lower, it would be 5 cents worse for them than for that company. By this 5 cents he referred to the fact that

the competitors, in order to sell to their customers, must still pay the accrued profits for the year 1909, which were not due until the end of 1910.

Bedford, in the letter to his son of March 28, 1910, declares his policy. It was to subordinate all profits and to use all their energies to increasing the grind. No thought of profits even in specialties at first should come in, which in any possible way might interfere with the greatest volume of business. Candy without profit, syrup without profit, jam and jelly without profit—all to increase or maintain the volume of business. Profits, if need were, should go to 8, if necessary to 5, cents a bushel, and if that did not serve to retain their position the prices should go practically to cost, making up by getting good prices in good seasons.

There could hardly be a more unequivocal statement of policy than this, or one which better fitted the plan as the government asserts it.

### (B) Execution of the Plan.

How far the defendants have succeeded in executing the plan suggested in the correspondence cannot be absolutely proved, but I am disposed to think the evidence convincing that they actually did succeed, just as they had proposed. The matter is somewhat complicated by several factors: First, that the price of corn began to go down in June of 1909 until April of the next year. From then until the 1st of September it rose, but fell again until on February 1 it had reached only 25 cents a bushel. (The price of corn is throughout figured after deducting the sale price of the by-products, and the prices are therefore, of course, conventional. Both parties accept this method for convenience.) From then until November 1, 1911, it rose, and continued with variations at between 50 and 55 cents until the end of 1912, when it fell again to less than 30 cents. It is perfectly true, as the defendants assert, that the price of both glucose and pearl starch varied generally with that of corn. The chart put in evidence by the defendants shows that after the middle of the year 1908, when competition had become effective, the prices had a general correspondencce; but a closer examination shows, I think, that there was a very large drop in net profits, just as the defendants proposed. We may begin with gross profits, by which I mean the difference between the price of corn (the value of by-products being deducted) and the price of glucose and starch; this difference is called the "spread." For glucose the average gross profits for the year 1908 had been 38 cents, and for 1909, 33; in 1910 it dropped to 27 cents, and in 1911 to 25 cents; it rose in 1912 to 31 cents, again in 1913 to 32 cents; 1914 is not a fair test, owing to the war.

Similarly in the case of starch the gross profits fell from 29 cents in 1908 and 23 cents in 1909 to 18 cents in 1910 and 15 cents in 1911. In 1912 it rose to 20, and to 21 cents in 1913. The lowest figures in each case were, therefore, reached in 1910 and 1911, the period during which the campaign was to be carried on as planned in the letters already mentioned. It should be remembered that this gross profit by no means shows the full proportional fall in prices for competitive purposes, because out of it must come cost of production, and

this, so far as appears in the testimony, was constant. If, for illustration, we suppose a profit of 10 cents a bushel on glucose and 8 on starch in the year 1909, we should have a manufacturing cost of 23 cents and 15 cents, respectively. We should find the net profits on glucose to be 10, 4, and 2 cents for the years 1909, 1910, and 1911, indicating a cut in earnings of 60 per cent. and 80 per cent. In starch the figures would be 8, 3, and nothing, an even more radical cut. If we supposed even that net profits were 50 per cent. of gross in 1909, the figures would still be 16½, 10½, and 8½ for glucose, and 10, 6, and 5 for starch. The last figures certainly presuppose too much net profit in 1909, yet they show a decrease of 50 per cent. in net earnings. The earlier figures are probably not too low for net profits, at least on glucose. All this assumes a fixed cost of production, and no suggestion is made of any improvement in technique during the period. We may be sure that such evidence would be forthcoming, if it existed, because the proof lay easily within the defendants' power to produce. Nor can we suppose that the first unit of Argo which opened on March 28, 1910, affected the cost, since it is uniformly stated that a plant of 10,000 or 15,000 has full economic efficiency.

The subsequent rise of prices in 1912 and 1913 may have been due to the change in the differential between grape sugar and glucose, or to the investigation preceding this suit. I think the causes of this rise too uncertain and speculative to justify any finding.

## (C) Sales Below Cost.

The government in further proof of the execution of the low-price campaign asserts that the defendant was actually selling glucose at less than cost during portions of the year 1911. That they were for some time selling "Karo" syrup at less than cost above glucose is abundantly shown, and will be considered when I come to the syrup-mixing business. The contention regarding glucose rests on some tables sent by F. T. Bedford to his father in May, 1912, designed to show the cost of "Karo." These tables are figured upon the price which the glucose that went into "Karo" would have brought upon the market, and were the subject of a long and complicated controversy at the trial. The tables show the price at which glucose was billed to the syrup-mixing house, which was in all cases somewhat less than the price at which it sold in tanks; the difference being designed apparently to represent the selling cost. In order to get the profits on the glucose included in the "Karo" sales, the cost of manufacturing the glucose which was shown on the tables was subtracted from the price at which it was billed to the syrup house, and the resulting difference was stated in cents profit per pound. In certain instances this profit appears as a loss. For example, in April and May of 1911 the sales touched their lowest point, showing either a loss or only 1 cent profit per 100 pounds, and it is upon these instances that the government relies to prove its position. Similar tables were made for "White Flake" syrup and for the standard syrups of the defendants, which show either losses or negligible profits for the same months.

Moffett attempted to explain away the effect of this proof as fol-

lows: He said that the tables in the column containing the selling prices showed, not the price of glucose at the time of delivery, but at the time when the order came to the syrup house. These orders were for deliveries at 20 or 30 days, and as corn was always bought against the orders, so as to insure the profit, the price of glucose at that time was at once charged against the order. Yet the manufacturing cost was figured in the month in which the glucose was made.

Moffett was mistaken in his recollection of the plan upon which these tables were prepared. First, his May vouchers corroborate the government's position rather than his own, for they show the price of May deliveries as $1.20½, and the tables show them at $1.20. Second, if he is right, the prices of these May deliveries should figure opposite the June syrup deliveries, if the syrup deliveries were at 20 or 30 days, and were at once charged with the price of glucose when the order was made. The June deliveries were therefore being ordered in May. Now the June deliveries were charged with glucose, not at $1.20½, but $1.35, which is much further from the May entry than $1.20½. The vouchers strongly corroborate the government's interpretation.

Yet, if he were right, the proof would still be that glucose was sold at a loss, or substantially at cost, because, in order to find the profit and loss on glucose under Moffett's contention, it would be substantially correct to compare the cost of glucose in one month with the price at which it is entered in the succeeding month, in the price column, since the price in the succeeding month indicates the average of delivery prices 20 or 30 days earlier, as has already been said. When the market began to rise, in some instances, under this interpretation, the defendants sold glucose at a loss. Take, for example, the cost of glucose for blue "Karo" in August, 1910, which was $1.38. The price of glucose for blue "Karo" in the succeeding month, September, 1910, was $1.35. If $1.35 indicates the average selling prices 20 and 30 days earlier than September, then in August the defendants were selling it at a loss of 3 cents. Again, take the price of glucose for blue and red "Karo" in September, 1910, which was $1.28 and $1.32, respectively. The selling price in October was $1.20 and $1.28, respectively, showing a loss in each case, if the price column represents current prices 20 and 30 days earlier than October. In the month of January, 1911, glucose for "White Flake" cost $1.02; the price in February was $1, showing a loss in sale of 2 cents per 100 pounds. The cost of glucose for standard syrups in August, 1910, was $1.38, exactly the price charged against the syrup house in September, 1910. Again, the cost of that glucose in September, 1910, was $1.28, exactly the price charged the syrup house in October, 1910.

### (D) Profits from Specialties.

The government also seeks to show the low prices of the year 1910 by deducting the known profits from specialties for the year from the profits for the whole year. The remaining sum they divide by the number of bushels ground, and so get the net profit per bushel. Much of this calculation seems to me to be too speculative for safe inference, but I think there are some kindred facts which corroborate

the conclusion that the profits for the year were very low. We know the profits upon the sale of standard syrups and "White Flake," because they are contained in F. T. Bedford's tables of May, 1912. We also know the number of pounds of grape sugar made, and that the differential between grape sugar was 14 cents, with no added expense. Indeed, if we were to accept Edinburg's testimony, we should have to make the differential 24 cents, as he considers the price of the barrel 10 cents cheaper; but that element I omit. The profits on the syrups were $522,626.01, and the total differential over glucose on the grape sugar, $226,917.48, making a total of $749,543.49. The total profits for the year 1910 were $2,102,611.45, leaving a residual profit of $1,353,067.96 to be accounted for by the total grind, less the amount which went in to make syrups. The total grind was 36,203,652 bushels, and that going into the mixed syrups other than "Karo" 4,556,916 bushels, leaving 31,646,739 for the glucose, grape sugar, and starch. If we divide this into the residual profits, we get a profit of about 4⅕ cents a bushel. It should be remembered, however, that a substantial amount of this grind was sold as Kingsford's starch and thin boiling starch, and I think it quite safe to estimate that the profit per grind on the staples for that year was not 4 cents a bushel. This was much lower than the usual profit in the trade. In Bedford's letter to his son of March 28, 1910, already twice quoted, he speaks of 5 cents as a low profit, even during a trade war, and in F. T. Bedford's letter to his father of July 8, 1909, he says that the proposed profit of 10 cents on glucose would be equivalent to only 4 cents a bushel, a return so small as must be made up for in specialties. The calculation seems to me added proof of the low-price campaign based upon unquestionable evidence. I believe that the profits were lower, perhaps even as low as 2.07 cents; but I only find that it was no higher than 4 cents a bushel, and that this was lower than a fair profit.

It should be observed that, under the calculation as I have figured it, it is proper to include in the number of bushels to be divided into the residual net profits the bushels used for grape sugar, since the differential subtracted for grape sugar was the profit over the profit on glucose, and that all grape sugar made the profit on glucose as well as its own differential.

### (E) The Judgment of the Trade.

That the trade supposed the prices to have been cut appears from the evidence of the witnesses, who said that prices were uncomfortably low and that they were hard pressed. Peckham, president of the Clinton Company, says that at times prices got below cost, that extremely low prices went into effect after the rebate plan was abandoned, that they continued until 1912, that in 1910 he did business without any profit, and in 1911 with a very small one. Hughes, of the Union Starch Company, says that little or no money was made in those years. Edinburg, of the American Maize Company, says that in January, April, May, and July of 1910 his books showed a loss, though not for the whole of the year. Hubinger found the Corn Products Refining Company prices very low; his plant was

not profitable in the years in question; in some months there was a loss, and in some months a profit; a small profit at the end of the year; 1911 was better. Piel says that the prices were abnormally low, and that it was pretty hard for a man to stay in the business during those years. Douglas says that the prices were lowest in 1911; an audit of his books shows a net profit for the year ending October 31, 1911, of less than $5,000. Several of the witnesses experienced a demand from their customers for a guaranty against Corn Products Refining Company prices, foreshadowed in the correspondence between the officers of the company.

From all these considerations I find that the so-called "low-price campaign" actually went into effect. It does not appear how far the defendants succeeded in their maneuver of inducing their competitors to load up with long contracts, though they did succeed in discouraging them greatly with business, and perhaps this may have led directly to the complaints out of which this proceeding took place. In 1912 the pressure which they exercised upon the trade abated; but, as has already been shown, the defendants came under investigation in the autumn of 1911. How far there is any causal connection between those two events, as I have already said, rests too much upon inference to justify a finding. Yet the connection appears to me to be not wholly without significance.

### 2. Manipulation of Prices.

Enough has already been shown in the expressions of the defendants to prove that at least they believed they had entire control over the price at which the product should be sold. Walden's letter of November 4, 1909, is a naïve confession of this power. He and Bedford in that correspondence are discussing whether it would not be better to disguise their power by a reduction which would not be so unheard of as 50 points in one day, which Bedford apparently proposed, making, as he said, "one bite to the cherry." Whatever was in fact their power, the change in prices beginning in November, 1909, suggests strongly that Walden's policy won. Nor is this the only instance, for in the correspondence of July, 1909, in which they are discussing abandoning the profit-sharing, the presupposition upon which the whole discussion takes place is that they may make prices as they wish. It hardly serves any purpose to go over this matter once more in detail; it is so constantly implied in all the correspondence that the letters must be read to obtain their full force. Some letters in 1908 show the same thing. On November 20, 1908, Smith wired F. T. Bedford, speaking of lowering or maintaining prices upon the assumption that it rested with them to do so. F. T. Bedford replied on the same day by a wire which implied the same thing. On December 10, 1908, Walden wired Bedford, one passage of which is as follows:

"I would recommend, first, that we make contracts with the confectionery trade to April at present prices; about a week or so from now force the hands of our competitors on their yearly contract by making a low price basis for them to work on."

The plan seems to have been put into effect. On December 1, 1908, the "spread" between glucose and corn was 50 cents a bushel; on

February 1, 1909, 35 cents. The figures for starch are 43 and 24 cents. In each case the profit-sharing is deducted from the price. I have used Mahana's diagrammatic table, and not Defendants' Exhibit No. 78, which was not actually offered in evidence. No change in technique accounts for this change in the "spread," and Fisher's figures of the loss in corn seem to me irrelevant. Taken in connection with the proposals in the correspondence, there seems to me no reasonable explanation, except that the prices were manipulated for the purposes declared.

In the early years of the combination a mere glance at the Mahana table shows that the corn did not control the prices, but that these were maintained where the defendants chose to place them, though this absolute control certainly ceased after competition began to be active.

Many of the witnesses called testified that they followed the prices fixed by the defendants, and this is undoubtedly true. The defendants set the prices of the staples of the industry, published them, and the rest of the trade generally followed. A distinction must, however, here be taken between actual control by the leader, and voluntary following by the independents. A producer may still be the largest in the market, and yet be unable to force others to follow his lead. That would depend upon his capacity to fill the larger demand which would arise from his lower prices. If, for example, he was producing nearly up to his capacity, he would be unable with a drop in price to increase more than to that limit, and, indeed, it would be hard to imagine any purpose in lowering his price, for it would result in the economic solecism of two prices in the same market. If, however, the elasticity of the largest producer's capacity of production were so great that he could accommodate it to the increased demand as the price fell, then he has an absolute power to compel all other producers to follow him down when he lowers his prices.

The defendants had the necessary capacity. We may omit the years 1906 and 1907 and take Moffett's table of grind, with a maximum working year of 350 days, which he gives. The defendants' utmost capacity and the yearly grind of the industry are given in the following table:

|  | Total Grind. | Defendants' Full Capacity. |
|---|---|---|
| 1908 | 34,774,000 | 31,500,000 |
| 1909 | 38,861,877 | 33,775,000 |
| 1910 | 47,887,377 | 40,775,000 |
| 1911 | 46,084,854 | 42,000,000 |
| 1912 | 47,542,157 | 45,500,000 |
| 1913 | 50,340,235 | 52,150,000 |
| 1914 | 45,801,973 | 45,150,000 |
| 1915 | ......... | 46,375,000 |

From this it appears that the full capacity of the defendants was equal to the whole demand at the prices fixed in 1913 and 1914, to substantially the full demand in 1912, to 85 per cent. and 90 per cent. of the demand even in the low prices of 1910 and 1911, and to the 90 per cent. in 1908 and 1909. When it is remembered that their increased capacity in Argo was foreshadowed as early as 1909, it is a safe conclusion that in lowering prices in 1910 they exercised a real economic coercion upon their competitors, and that the very numerous witnesses who said that they dominated prices were speaking more than figuratively.

The government's figures give a greater grind than those I have given, but I choose the defendants to be on the safe side. I conclude that their implicit assumption throughout their correspondence of a power to manipulate prices was correct, and that this power they exercised for the purpose of harassing competitors.

The power to raise prices is quite different. It depends upon the inducement to the independents at existing prices. After 1907 I think the capacity of the independents was sufficient to prevent raising prices beyond the vague area at which the price became sufficient to induce new capital into the industry. It was not possible indefinitely to raise the price of a commodity which, like this, enjoyed no natural monopoly, and the power to raise prices was limited by that fact.

### 3. Discrimination in Prices.

The government alleges that the defendant has discriminated in its prices among customers; but the evidence is very slight, except for the Stein, Hirsh & Co. matter. The methods of selling "Karo" to the eventual consumer admit of favoritism, and it is a reasonable supposition, I think, that some favoritism was practiced. Bedford, in his letter to Walden of August 15, 1911, spoke of the manipulation of weak spots by Mr. Durham's trade method when referring to the "Karo" trade, and his letter to his son of September 12, in the same year, spoke of continuing "deals" in weak places as long as was thought necessary in order to get the volume of the business they were seeking. I can find no evidence of the misuse of the so-called "zone system," a system which in itself is entirely capable of equitable application. Theoretically the consumer on the near side of the zone is discriminated against in favor of him on the far side; but, if the zones are fairly organized and not too large, and the radial difference from the routing point of places within the same zone is not too great, there seems no objection to the system, and it certainly makes for convenience and economy in practice. In general, I find the evidence too scanty to justify any finding that the defendants have attempted a genuine price discrimination, though they unquestionably had it in their power to do so.

### 4. Price Manipulation of Grape Sugar.

The defendants continued substantially the sole makers of grape sugar until the end of 1908. During the year 1909 the Union Company made about 4,000,000 pounds and in 1910 the American Maize Company began, and together they made about 8,000,000 pounds, or

5 per cent. of the total supply. In 1911 this had increased to over 10,000,000 pounds, about 6 per cent. Throughout the year 1911 the differential between grape sugar and glucose was 14 cents a hundred in favor of sugar. The expense of manufacture was substantially the same, except for the price of the barrel, which was, perhaps, some 10 cents cheaper for the sugar. The difference of 24 cents, according to Edinburg, of the American Maize Company, proved an attractive inducement to him, and it is obvious that the competition had begun to count by the end of 1911. The production of the American Maize Products Company for January, 1912, was about 1,500,000 pounds, but during that month the differential was cut by the Corn Products Refining Company from 14 cents to 9 cents. There followed an immediate diminution of the production of the American Maize Products Company to 450,000 pounds in February. The differential continued at 9 cents until July of that year, by which time the production of the American Maize Products Company had risen again to a point exceeding that of January. The differential was then cut to less than that of glucose for a few weeks, and then fixed at 4 cents until the middle of October. The production of the American Maize Products Company broke in half, whereupon the differential was restored to 9 cents until December of that year, when a slight differential appeared in favor of sugar. This continued substantially through the first half of the year 1914, when the production of the American Maize Products Company was at an average of about 600,000 pounds a month. Edinburg says that the variation of his grape sugar production depended entirely upon the differential between glucose and sugar; that when he found that differential large he increased his production, and as it fell he reduced his production. I have used the table of Benham & Noyes, which contains the freight differential.

Moffett's explanation of the change in the differential is that they had always thought it cost more to make grape sugar than glucose, and that in 1912 they discovered their mistake. The coincidence between the growth of the competition and the slow change downward of the differential is better reconciled with the more obvious explanation. Moreover, it is very hard for me to believe that persons as skilled in the detailed expenses of production as the defendants should for so many years have been misled as to an operating cost which must have been fairly obvious in itself. Whether they kept, as Edinburg did, any record of their operating cost, does not appear; but it seems to me too much to ask us to accept the explanation suggested. I find that they manipulated the price of grape sugar to meet competition, and that they had knowledge of the amount of that competition.

### X. Efforts to Fix Prices and to Restrict Production.

#### 1. Starch Agreement of 1906.

In 1906 the Corn Products Refining Company produced only about 63 per cent. of the total starch made, and a meeting took place at New Haven between Walden and Reichman, representatives of the Corn

Products Refining Company, and Piel and Douglas and Tooker, independents. What took place at this meeting is in dispute under the testimony. Hubinger says that the Corn Products Refining Company was to set the price and the others were to follow. Douglas says that they did not agree to maintain a price, but that it was an informal talk, in which they endeavored to maintain each other's prices, which were to be based on Chicago rates. Tooker, the vice president of the Douglas Company, says that there was no agreement to maintain prices, though they discussed the matter generally, and Reichman corroborates him. It was agreed, however, that Reichman, under an assumed name, should write to Hubinger's brother under an assumed name, stating the rates from Chicago, upon which the prices were to be based. Those witnesses who say that no agreement was made insist that this letter was only for the purpose of informing Hubinger of the freight rates. The letter is in evidence, dated November 8, 1906. Some of the matters in it certainly suggest a price agreement. For example, it is stated that on starch guaranteed to comply with the national Food and Drug Act the price is to be 15 cents above the price of ordinary pearl starch, a subject having nothing to do with freight rates.

This document seems to bear out the construction placed upon the interview by Douglas and Hubinger, and I believe and find that there was an informal understanding by which the persons at the interview were to maintain the price of starch. There is no evidence as to how long this continued, but I hardly think that it lasted very long.

In connection with this may be noted the correspondence regarding splitting commissions by starch brokers, a practice which Walden endeavored to prevent. This effort was undoubtedly to maintain the defendants' own prices uniform, and was therefore of an entirely different character. That the Corn Products Refining Company should desire not to have varying prices on their own products in the same market was in no sense illegal. Indeed, the opposite practice lends, itself readily to that price discrimination which is an easy device for monopoly.

There were several meetings in 1909, both in New York and Chicago, between Bedford and the starch makers. The upshot of these meetings is in considerable dispute. Douglas says that in one of them Bedford directly proposed the joint reduction of grind, but the others refused. Tooker denies that Bedford made any such proposal, and, on the contrary, says that he refused a price agreement when it was suggested to him. Reichman bears out Bedford, but he is not a weighty witness. Some time in 1909 Hubinger and Bedford had another private conversation about curing the demoralization of the business, in which Hubinger says that Bedford told him the only way he knew was to restrict the grind. Hubinger suggested a clearing house. Bedford acknowledges that the conversation took place, but denies that at that or any other time he ever suggested restriction of the grind to any one. Taken on the testimony alone, there is hardly sufficient evidence to justify a finding that he did; but his letter to Walden on July 9, 1909, makes the weight of probability in favor

of the fact as testified by Hubinger and Douglas, and certainly alto·gether discredits Bedford's denial. This was one of the letters dis-cussing the termination of the profit-sharing, of which a number have already been noticed. In giving his reasons for not announcing the profit-sharing at that time, he said that there were several things un-der consideration, of which he enumerated five. The first was an agree-ment as to total grind; the third, possibility of going into the candy business. Bedford was necessarily wholly unable to give any explana-tion for this letter, except the childish one that it might have been a typographical error, or that it might refer to a limitation of his own grind.

On the same day, in his second letter to Walden, which has already been noticed, he was discussing what should be said to the candy makers in relation to the company's righteous resentment at the ag-·gressive attitude of the National Candy Company. He says that their suggestion that the candy makers shall buy of them is very moderate, and does not bring about any aggressive competition with the National Company, because they, the candy makers, were to agree with the National Candy Company to maintain good prices, and that the only reason why the defendants could consider the ·proposal was that Hoops and Heide guaranteed promises of the National Candy Company to at least a limitation of their glucose business, which was a matter, however, of which, perhaps, they could not talk, because it might be illegal. Bedford admitted that Hoops and Heide said that they could get a limitation from the Clinton ·Company, but insists that he did not entertain the proposal.

There cannot be the least doubt that in 1909 one of the devices which was in the defendants' minds was a limitation of the grind, and this contemporaneous documentary revelation of their purposes to my mind makes it probable that the discussion was of the tenor which Douglas and Hubinger remember. I do not believe that there was any such agreement, because my conclusion is that during that year the defendants decided upon lowering the price by their own low-price campaign.

## 2. The Suppression of Proposed Companies.

### (A) Federal Syrup Refining Company.

The government asserts that Bedford procured the suppression of a proposed glucose company in the autumn of 1912. This rests chiefly upon the testimony of Bertram Orde, a witness hostile to the defendants. He had organized a syndicate for the erection of a new company, and had procured an option on the Douglas plant at Cedar Rapids. Among others, they invited Smith, a director of the Corn Products Refining Company, to join them, and he was thus informed of their steps. At one time they had secured subscriptions of about $1,250,000. Smith told Orde that Bedford was worried over the prospect of the plant, and was doing all he could to prevent its build-ing, and to influence the syndicate against it. The syndicate, in fact, dropped the matter in the middle of December, 1912. Bedford denied taking any such steps; but Smith was not called, a circumstance of

weight. The government's position is that Bedford induced Meyer, who was to be a substantial subscriber, to change his attitude, and the defendants' other conduct lends much plausibility to the theory. In support of this the government produced a letter written by Bedford to Smith on October 28, 1912, in which he says he is pleased to note that Meyer is with them at heart and trusts that his conversion may extend to his managers. It should, because "Karo" was going to be the seller on the whole more profitable and easier of sales than any other syrup. This letter refers, I think, to Smith's letter to Bedford of October 25, 1912, in which he said that Hubinger's constant activity had prevented at least two of Meyer's managers from falling in line for "Karo" at "yesterday's meeting"; they wanted to await the next move of Hubinger. I do not believe that this refers to the Federal Syrup Refining Company, and I think the evidence doubtful as to the interference by the defendants with Orde's plans, and decline to make any finding upon that score.

### (B) The Staley Manufacturing Company.

Staley was a packer, who began business in 1898, but bought all his starch of the manufacturers. In November of 1906, having found difficulty in procuring as much starch as he wanted at satisfactory prices, he incorporated his business and considered building a plant, and in March, 1907, Walden wrote him a letter, offering him certain bulk prices on starch, in consideration of which he was to agree for the term of the contract not to engage in preparing or grinding corn in the manufacture of starch, nor to take any action toward equipping his factory with machinery for that purpose. This proposal Staley did not expressly refuse or accept in his letter of March 18, 1907, and in Walden's answer on March 20 he suggested that his own proposal on starch implied a contract for three years, and not for one year, as he understands Staley to suggest. Staley did not begin until June 1, 1909, when he bought the old Cutsinger Starch Company, which had been discontinued by the National Starch Company. Even then he did not begin to grind until March, 1912, and had to shut down again in June; he began again in September, when he ran until July, 1914, with some interruptions. At that time he closed, but has since that time opened. Walden had advised him that he was undertaking heavy responsibilities, and that he could buy the starch cheaper than to make it, and he seems to have been on the whole somewhat unsuccessful. He believed that the defendants made the prices in the market, but I cannot find any evidence that they adopted toward him any unfair practices after he got started. Walden's letter was, of course, an attempt to keep him out of the business, and, taken in connection with the general intent shown through the whole of defendants' conduct, was an illegal effort; but I do not find that in its execution there was any unfair practice.

### XI. FREIGHT RATES.

#### (1) East-Bound Glucose Rate.

On September 20, 1905, the barrel rate of glucose from Chicago to New York was 25 cents domestic, and 20 cents export, which it had

long been; at the same time, the tank rate was 17½ cents domestic, and 15 cents export. The barrel corn rate from Chicago to New York at the same time was 17½ cents, and Edgewater had a transit privilege to New York of ½ cent; the usual lighterage charges being 3 cents. By "transit privilege" is meant the right to carry the corn to New York from Edgewater at ½ cent per pound after it is made into glucose. The lake and rail rate on corn from Chicago to New York was not fixed at this period, especially as rebates were. common; but it probably was not far from 10 cents. The greater part of the corn, which came to New York, came by way of water to Buffalo. Gantt, the traffic manager of the Corn Products Refining Company, testified that probably about 70 per cent. of the whole came in that way. On this corn the rate had therefore been in the neighborhood of 11 cents, as against a tank rate for glucose of 17½ cents, a differential of 6½ cents, and a barrel rate of 25 cents, a differential of 14 cents. These were heavy advantages in favor of Edgewater in its New York business.

In 1907 the Union and the Clinton Companies began their manufacture of glucose, being the first competitors, and on May 1, 1907, the railroads advanced their glucose rates to 30 cents domestic and 25 cents export on both barrel and tank, thus increasing the differential on the domestic barrel rate from 14 cents to 19 cents, and on tanks from 6½ to 19 cents. The independents objected to this, and succeeded in getting the railroads to reduce the rates on September 1, 1907, on both tank and barrel, to 25 cents domestic and 22½ cents export. This still left a marked advance in tanks, but restored the barrel rates to about what they had been. On April 15, 1908, Ingalls, the freight traffic manager of the New York Central Lines, and Morgan, the assistant general freight agent of the Nickel Plate Road, wrote to Kersting, of the Clinton Company, that on June 1, 1908, they would make a further compliance with their demands by reducing the rate on both barrels and tanks to 21½ cents domestic and 20 cents export. These reductions never took place, but on April 23 of that year these officers notified Kersting that another hearing would be had. This hearing took place after several adjournments, and the roads declined to make any further changes. Thereupon the independents took the matter to the Interstate Commerce Commission, which held the rates unreasonable (State of Iowa v. A. C. L. R. A., 24 I. C. C. 134) and finally fixed the rate for both tanks and barrels at 20 cents domestic and 18 cents export in August, 1912.

By the recent 5 per cent. general increase allowed by the Interstate Commerce Commission, the domestic rate was raised to 21 cents, and remained until March 1, 1915, when it was advanced again to 25 cents for domestic and 20 cents for export. These increases were justified by the decision of the Commission on November 9, 1915— "Glucose from Chicago," 36 I. C. C. 379. In this decision, however, the Commission took away the transit in favor of Edgewater, which amounted to 2½ cents. Therefore, if the 5 per cent. increase be disregarded, the actual result of the increases made after 1912 amounts to 1½ cents domestic and an actual lowering of the export rate, if the transit formerly applied to it. The basis of the Commission's deci-

sion was that, although Edgewater had a genuine advantage through its differential in New York, that advantage did not exist for Boston, Philadelphia, Pittsburgh, Reading, Harrisburg, Rochester, Albany, Buffalo, and Baltimore, because the combination corn rate to Edgewater and the proposed glucose rates to the cities named was in excess of the glucose rate paid by the independents.

These being the undisputed facts, the government asserts that the changes in rates in 1907 and 1908 were due to the improper intervention and interference of the defendants. The support of this rests altogether in the correspondence. The first rise, as stated, occurred on May 1, 1907, and was known to Ashcraft, the assistant traffic manager, and Tremain, the traffic manager, in March and April of that year. Tremain's letters are not in evidence, but several letters from Ashcraft to him appear, and they show that he was quite aware, as was, of course, inevitable, of the advantage which the increase would give to him in securing a differential in favor of Edgewater. It was a fair inference from the letters of March 31 and April 1, 1907, that the rate had been secured by solicitation to the railroads themselves, and that the motive was in order to check the growing competitors in their Eastern business. There is no evidence, however, that this was procured by any corruption of the railroad or its officials. One purpose was to raise the rate on glucose and lower it on syrup, so as to reduce the profit to the syrup mixers. It is to be noted in this connection that the year 1907 was the first in which the defendants entered the syrup-mixing business. The letter of April 3, 1907, corroborates this interpretation, and, like the others, is full of intimations of suppression of and secrecy about the real facts.

The rates established were certainly higher than were justified, and were reduced in September, as already shown. That Ashcraft was aware of the indefensibility of his support of a higher rate than that existing appears in his letter to F. T. Bedford on September 21, 1907. The independents were not satisfied with the rate as lowered, and continued their agitation; the matter was then referred to the Central Freight Association. The railroads were concerned lest the matter be carried to Washington, as Ashcraft wrote F. T. Bedford on February 20, 1908.

The crux of the matter lies in what was done between March and July of 1908; i. e., what was done "in the nature of lobbying," as Ashcraft wrote to F. T. Bedford on March 16, 1908, and what pressure was exercised upon the railroads to maintain the rates and to suffer the matter to go to the Interstate Commerce Commission. That there was private access to the presidents of the roads, and that there was pressure of some sort, seems to be unquestioned. The correspondence throughout shows that the defendants were in constant private communication with the railways, and were even supplying them with arguments to use in answering the independents themselves. The traffic managers having decided to reduce the rates, their subsequent change of mind was almost certainly produced by the intermediation of the defendants. On April 21, 1908, after the original decision had been made, Ashcraft wrote to F. T. Bedford that from the efforts made it was apparent what they were to expect if

the matter was not taken up with the presidents as he had urged; that, confidentially, he was supported in this advice by the high traffic officials. This, of course, means that he had been in private communication with the high traffic officials of the railroads, and that they had advised him that they were powerless against the importunities of the independents, unless the defendants could take it up with the presidents. From this letter it also appears Bedford had himself talked with some of the officials, in spite of his present denial. The communication between the defendants and the railroad officials also appears from F. T. Bedford's wire to Ashcraft on April 22. On April 23 he wired Ashcraft, suggesting that the Pennsylvania could be induced to take no action if the American Maize Products Company at Roby withdrew their requests, and that Reichman should see Scully with that in mind. Ashcraft answered on the same day that he would see to it, and agreed that the case would be much weakened if Scully should withdraw.

In fact, Scully, who was fighting the existing rate, had a talk with F. T. Bedford, who told him that he wished him to withdraw his objection and let the rates continue. Scully continued, however, to oppose, until he got word from Boselly to withdraw his objection a day or two after. Gardiner, also of the same company, was stopped in his activities and actually withdrawn from a public meeting with the railroad officials. Gray, Boselly's intermediary, was indefinite in his recollection of the matter, but it certainly took place as stated. The importance of Scully's withdrawal is further shown by the wire of F. T. Bedford to Ashcraft on April 23, 1908, in which he said that Hodgson, of the Pennsylvania, had told him that if Scully withdrew he would have no further interest in it.

My conclusion from this evidence is that the defendants attempted, both in public meetings and by private communication and importunity, to secure the original rise in rates of May, 1907, and to prevent the reduction proposed on April 15, 1908; that in so doing they procured Boselly to withdraw his objection and attempted to get Scully to give a false reason. I believe that this was a part of their arrangement with Boselly in the spring of 1908, by which they should purchase half his grind. I find no evidence, with the exception of the suggestion concerning the Nickel Plate Road, that there were any bribes to the road or to the officials, or any threats used; but I do find that the effort was to continue the differential with the purpose of preventing any competition with Edgewater. I find that at the time the differential gave an undue advantage to Edgewater in supplying New York and its environs, but not elsewhere. I also find that the private solicitation of the railway presidents and supplying the roads with facts which were not known to the independents was an unfair method of competition. It need hardly be added that the methods by which the opposition of the American Maize Products Company was withdrawn was also unfair.

## 2. Transits.

I find no competent evidence to show that the change of the transits at Clinton were due to the mediation of the defendants, except a

passage in a letter from Ashcraft to F. T. Bedford on January 2, 1908, in which he says that Clinton would be probably deprived of its glucose transits to St. Louis; yet this alone seems hardly sufficient to justify a finding that Ashcraft procured the change. The general policy of the company, stated in Ashcraft's letter of July 2, 1908, to F. T. Bedford, was, however, consonant with that possibility. He there said that he was trying to get the roads to believe that it was best for all concerned to take up and consult with him any question of the readjustment and change of rates in his commodity; that they were fast getting to realize that the defendants knew how to be fair in these things, and not to oppose advances on the idea that an advance is against the shipper; that his own idea was that adjustments were frequently more important to them than the rate itself. O'Halloran, moreover, said that Grossclose had told him that Ashcraft wanted the transits withdrawn; but this is hearsay. Disregarding that evidence, there remains a strong antecedent probability that the transits were removed through the instigation of Ashcraft. Yet there is no direct evidence, and in its absence I think the inference not certain enough for a finding. The same considerations apply to the change of transits at Cedar Rapids and Decatur, with greater force.

### 3. Barrel and Tank Rate from Clinton to St. Louis.

By very old adjustment, Clinton was entitled to the same rate on glucose to St. Louis as Chicago. In 1908 the barrel rate was 10 cents and the tank rate 7 cents, while the Clinton rate was 10 cents on both. O'Halloran, of the Clinton Company, wished the railroads to give him a 7-cent rate on tanks, which was done; but shortly thereafter the rate on tanks in both places was raised to 10 cents. I think it reasonable to suppose that this change was procured by Ashcraft, because of the correspondence between him and F. T. Bedford. On January 7 he wrote F. T. Bedford that Clinton was making application for the same rate on tanks and barrels which Chicago enjoyed; that with their plant at Granite City getting into St. Louis on bridge toll, and their plant at Pekin at 6 cents, together with the disability of Chicago, which was then being dismantled, they had no special reason for a tank rate of 7 cents from Chicago. Scully might also go after some of that business. He concludes:

"If Clinton's application for Chicago's rates should be voted down to-day, I believe the same rate could be forced in through proper agitation."

Bedford agreed to the same rate on barrels and tanks in his answer of January 9, and apparently went to Chicago, not observing, however, Ashcraft's injunction to bring his letter of the 7th with him, which he thought ought not to have remained on their files. I find from this correspondence that the subsequent rise from 7 to 10 cents was done at the instigation, or, as Ashcraft put it, the "agitation," of the defendants—that is, that they exercised at least persuasion over the road to make the rates the same for tanks and barrels. I find that there was no reason for the rise in the rate, and that the defendants' efforts were to prevent competition by Clinton.

## XII. The Syrup Trade.

The general charge in respect of the monopolization of the syrup trade is that the defendants, seeking to control the manufacture of glucose, included those end products which were made from them. Glucose, which for some 8 years has been generally known as corn syrup, enters into the composition of many syrups. The cheapest, and probably the widest used, table syrups of any are those which contain between 85 and 90 per cent. of glucose, flavored with 15 or 10 per cent. of refiners' sugar. Before the organization of Corn Products Refining Company, the Corn Products Company had put upon the market a syrup under the trade-name "Karo," already referred to, of this class. They had spent a good deal of money advertising it, but it had not obtained more than a place along with other brands. When the Corn Products Refining Company was organized, they continued to make "Karo," along with a general business in mixing other brands of their own, and also private brands of such jobbers as might wish. The labels for these brands they printed in large numbers and pasted upon the cans. Mixers also bought large quantities of glucose direct and sold it under their own brand. The position of the government is that the defendants kept the price of glucose and mixed syrup which they sold on substantially an equality, allowing no differential which would justify the industry of mixing at all; that in this way they gradually drove the mixers out of business, and then declined to make any more syrups themselves under the private brand. The result of all this was that the whole trade, or substantially the whole trade, remained in their hands under their name "Karo," or under one or two of their standard brands, which they retained.

The defendants at first seem to have enjoyed a substantial monopoly in the mixing trade among glucose manufacturers. During the first two years they alone mixed any corn syrup. In 1908 the American Maize Products Company, their only competitor, mixed about 5 per cent. of the total syrup mixed by glucose manufacturers; in the next year the Union Company appeared. The American Maize Company discontinued in 1909, and thereafter only the Union Company and the Hubinger Company have mixed. During the years 1912, 1913, and 1914 they have mixed about 12 per cent. of the total supply made by the glucose manufacturers.

The defendants urge two objections to this presentation: The first is that it leaves out of account the private mixers; and, second, the competition of corn syrup with the other various syrups—a question which has already been touched on. I am satisfied that the corn syrup proper, by which I mean a syrup containing 80 per cent. or more of glucose, is regarded by the consumer as a substantially different article, both by taste and by custom, from those which contain 40 per cent. or less. The molasses, sorghum, and cane syrup contain a smaller percentage of glucose, and, although there may be no deceit involved, they are in fact harmlessly adulterated. Of course, I do not suggest that such syrups are illegal or improper as sold.

The corn syrup proper is, and necessarily must be, confessedly a

flavored glucose, and the distinction between the demands seems to me substantial. Of course, these two commodities will, at certain prices, compete with each other; but upon that score I need add nothing to what has been said previously. I think it proper to consider, therefore, the percentage of the supply of corn syrup which the defendants control and their conduct to obtain it.

*1. The Purpose of the Defendants to Control the Syrup Industry.*

It was the purpose of the defendants generally to extend the Corn Products Refining Company's control as far as possible into all end products, and among other such to get as large a percentage of the syrup industry as was possible. This appears in several letters, most of them from Bedford, sometimes by way of fatherly advice to his son, drawn from his own prior experience in the Standard Oil Company, which he said had adopted precisely the same policy. Their attitude toward the syrup mixer himself was at one time ambiguous. Thus Smith wrote to Bedford on April 10, 1907, a letter which illustrates the defendants' attitude of mind. He was there urging that the syrup mixers should be protected, and for that reason for himself he preferred to maintain a greater differential between glucose and syrup, so as to tie the mixer to the company. If they themselves could make syrup cheaper than the mixer, they should tie him to them with a contract, unless they were determined on a "war of extermination." If they were to have such a war, there ought to be no outstanding contracts to cause embarrassment. As things were, they had already aroused a feeling of resentment among the mixers, and for that reason they might as well try to exterminate them at the same time by adding pure maple syrup and the higher grades of jelly, as well as New Orleans molasses. Yet Smith had his doubts of their success in exterminating either the mixers or any of the new competitors, all of whom were well fortified. He considers in detail the position of these new added companies, and is convinced that they could stand a long fight and keep up a long war. Yet, if there were to be a war, let it be to the finish, not the kind of sporadic war that Matthiessen used to engage in.

This ingenuous discussion was answered by F. T. Bedford, apparently at the direction of his father, on April 12, 1907. The writer inclined against an effort to tie the mixing trade to the company, and doubted the strength of the mixers' position or of the glucose manufacturers'. The inference is that he was for a war to exterminate the mixers.

This alternative seems to have been accepted, for it is quite clear from Ashcraft's letter to Tremain, March 21, 1907, that the plan was to raise the rate on glucose in part for the purpose of getting it on a parity with syrup, so as to eliminate any profit over glucose and make mixing impossible. Mention of this letter has already been made in the east-bound glucose matter. Wintermann, who had been in the St. Louis Syrup & Preserving Company, which went into the combination of 1906, organized a new company directly thereafter under the same name, and in 1907 Bedford bought the common stock of this company and entered into a contract with it to sell it glucose;

in 1910 he bought the balance of it and closed out the syrup-mixing business. It was at about this time that he wrote his son, on March 28, 1910, of the possible importance of this company as a good ally.

To return to 1908: It appears that by the end of that year the defendants supposed that they were selling to 90 per cent. of the trade, and that they contemplated getting part of the other 10 per cent., though they did not expect to get it all. This is in Smith's letter to Bedford of November 20, 1908. Bedford attempted to explain this letter by saying that Smith was referring only to glucose manufacturers who made syrup. But this cannot be so. In 1910 the Union Company alone was making syrup, and making less than 4 per cent. at that. Later on in the letter Smith says, "Our largest competitors in mixing line are working on low-price contracts for glucose," which is entirely inconsistent with the idea that the earlier part of the letter refers only to the Union Company. Whether they actually had at that time 90 per cent. of the trade may be open to question, but I am discussing only their purpose at this time. On March 29, 1910, Bedford in a letter to Walden recommends doing business, if necessary, without profit on the end products, so as to increase the sales of glucose, instancing the practice of the Standard Oil Company 25 years before, by which eventually petroleum drove out the other oils; that the proper course was to surround their business with the consumption products, syrups, candy, and preserves. They must take the mastery in these three specialties, so as to increase the consumption of their primary products. On the next day, in an added memorandum, he spoke of the logical right of the company to command the syrup business, and how the general outcry when they started in had died away; they need only take a firm stand to prove that they might dominate the jam and candy business, as they did the syrup business. That was the psychological moment for a campaign. On March 28, 1910, Bedford wrote his son in the same vein. He thought that all profits should be subordinated to increase the grind; there should be no consideration for profits in the specialties at the outset, which might prevent the greatest possible volume of business. He was in favor of doing the candy, maple syrup, and jam business without profit, even down to the extent of 5 cents a bushel, and, if that would not do, practically at cost.

Later in the year, when the low-price campaign was well on, several letters passed, showing the defendants' purpose. Walden wrote to Bedford on July 5 of that year that the syrup mixer might make specialties like maple and flavored syrups, but that the defendants did the bulk of the business in corn syrup.

About a year later they were discussing withdrawing all brands but "Karo." On July 25, 1911, Walden writes Bedford that, if they are doing 90 per cent. of the syrup business as it is, 30 per cent. under the "Karo" brand, it would mean, if they withdrew their standard syrups and sold nothing but "Karo," that the cost of advertising "Karo" would go down. There would be more or less of an outcry, he thought, from the jobbers generally; but the outcry would soon fade away if the trade realized they were uniting with them in moving these goods direct to the customer. If "Karo" could be made to

do 90 per cent. of the syrup of the country, it would become the name of a class of goods, and not a specialty.

That the defendants in fact sold "Karo" at no profit abundantly appears. This was the whole purport of the letters of F. T. Bedford to his father in May, 1912, together with the tables which have already been discussed under the heading "Sales at a Loss." Both in the year 1910 and 1911 this was done, even at a period when the profits on glucose itself were very trifling. On October 29, 1912, Bedford, probably relying on these tables, wrote to Smith that he had already told him there was no profit in "Karo," but that, with or without profit, they must have their share of the business. On April 4, 1912, he had written to Smith that it was 100 per cent. "Karo," and that as soon as possible. On June 24, 1912, in a letter of advice to his son, he instanced the course of the Standard Oil Company in Australia and South Africa, who got all their business in one brand. On June 30, 1912, F. T. Bedford wrote his father that he did not always advance syrup when they advance glucose, but that the syrup prices always went down with the glucose. Thus, in the month of April of 1912 standard syrups did not make within 1 cent a pound of the profit on glucose, and in the month of May 11 cents less.

By the 1st of August, 1912, they thought, apparently, that they had excluded all the syrup mixers, for Bedford wrote to his son that they recognized that now the competition was that of the glucose manufacturers. They recognized this policy to be unfair, as appears in the letter of September 30, 1912, from Bedford to Smith, in which he said that they could not have it known and might not talk of it, but that he had been advised by his lawyer that no law compelled them to make the same price to different customers as long as it was done without a contract with others. They might say, if need were, that they did not want parties to handle their syrup to the injury of their business.

In February of 1912, without much warning, Bedford called the jobbers together and announced that he would not sell any more syrup in private brands. His excuse for that at the trial was that the annoyance and expense involved in conducting that part of the business made it much more undesirable than not. But in the face of the correspondence already quoted, I cannot accept this as a true explanation. It is perfectly clear that they intended to have their own brands dominate the syrup market as much as possible, that in 1912 they had supposed that they had succeeded, and that they also anticipated a slow substitution of the single brand "Karo" for their own standard brands. It was a necessary part of this device that they should succeed in eliminating the private brands themselves. This would have left them in that dominant control of the syrup-mixing business, which is what they wanted; it would have left only the glucose manufacturers as their competitors. Whether Bedford's reference in the letter of September 30, 1912, to a discrimination in price was followed up by such discrimination, as I have already said, it is somewhat difficult to tell. The indications from this, and also from the method of selling the "Karo," which was by allowances, called "deals," and by other

means lending themselves to discrimination, strongly suggest to me that, in fact, there was discrimination. The reference of Bedford in his letters as to the manipulation of "weak" places is another corroborative circumstance. I think it extremely probable that throughout this "Karo" campaign there was actual price discrimination exercised wherever it appeared profitable; but in the absence of more specific proof I can make a finding no further than that the defendants showed an entire willingness to do this, and used methods which permitted it.

Such was the plan which they proposed to themselves in getting control of the syrup business, a plan which itself was part of their general policy to secure control of all the end products of the raw materials which they manufactured. It remains to consider how far they were successful.

## 2. The Execution of the Plan.

We have it on the admission of the defendants that they were trying to lessen the differential between glucose and syrup as early as 1907, and that by 1910 they were selling "Karo" at a loss over glucose. The effect of this was reflected in the distress of their competitors. The Union Company commenced in 1909, and made very little money. They would have made no profit, had they charged the market price of glucose, which seems to indicate that what we know to have been the practice of the defendants in 1910 extended at least to the previous year. The methods of merchandising the syrup also caused them some embarrassment. The zone prices they thought different from the usual way of figuring on Chicago plus freight, and the "deals" established an uncertain element, as well as the window-display allowances. Yet in spite of these handicaps their trade as syrup makers has greatly increased, having nearly trebled from 1909 to 1913.

The American Maize Products Company tried it for one year and then abandoned it, but the Hubinger Company established a substantial business during the years 1912, 1913, and 1914. So much for the mixing done by the glucose makers themselves.

Numbers of witnesses were called, for the most part mixers, who testified that the market was dominated by the Corn Products Refining Company. The use of this word I have already discussed, but under the circumstances of this case, considering the large proportion of the supply in the hands of the defendants, it seems to me to have a relevant significance. Several of them testified that the price of glucose and mixed syrup was either the same or so that they could not compete; in some instances they gave up altogether the sale of the higher percentage glucose syrups. Yet the testimony is by no means uniform. A number of mixers have continued in the business, and seem to find no difficulty in getting their syrup or glucose from other persons, either Scully, or the Union, or the American Maize Company. A tabulation has been prepared by the government of the percentage of syrups sold by wholesale grocers who testified in the case, amounting to 65 in all. The percentage of syrup bought from the defendants is 71 and from the independents 29. This probably represents as fairly as is accessible the proportion of the high percentage syrups sup-

plied to these customers by the Corn Products Refining Company. Some mixers still remain in this part of the business, but the greater number have gradually discontinued, and in many cases they attribute their withdrawal to the appearance and progress of "Karo.".

My conclusion is that in this grade of corn syrup the production of the defendants amounts to substantially more than half, and that their capacity for expansion is sufficient to give them the power to lower the price to such figure as they wish. I find that, except for the maintenance of substantial equality of price between glucose and syrup and the withdrawal of private labels, there were no unfair practices in detail in the marketing of "Karo," with some reservation regarding the uses which may have been made of "deals" and window-display allowances.

A word should be said as to the defendants' tables, which are made up for the year 1912 (Defendants' Exhibit 59–L). I do not accept the percentage of 13 as a fair estimate, because this attempts to lump all the syrups together into one, which, for the reasons already given, does not seem to me to be a reasonable test. The defendants claim that they supplied only 45 per cent. of the total trade, based upon a mixture of 85 per cent. glucose and 15 per cent. flavoring; but this is based upon the assumption that all the glucose sold by the competitors went into syrups, and it is very doubtful whether this be true. F. T. Bedford, in his letter to Smith of April 10, 1907, said that the defendants knew that a great part of the glucose did not go into corn syrup, saying that the mixer put fully half his requirements into goods not competitive with their own. This indicates that the percentage of 45 contained in Mahana's table is erroneous. The government, accepting F. T. Bedford's word, figures that the defendants made and sold 64 per cent. of the glucose syrup in 1912. I deem it impossible to obtain any exact information upon this score, but I think it conservative to estimate that more than half the trade is in the hands of the defendants. The rest of the glucose probably goes into those which contain a smaller percentage.

I find, therefore, that the plan to exclude the mixer from their subindustry has not succeeded to the extent that the defendants planned, and that as such a subindustry competition continues to exist and probably will continue.

### XIII. Dismantling of Plants.

One of the articles in the petition alleges the dismantling of the plants by the defendants. I have already considered the dismantling of the plants of the old Corn Products Company. Of those with which the defendants started in 1906, the Chicago and two Waukegan plants have been dismantled, and Davenport, Granite City, and Pekin have been reconstructed, some at large expense. The greatest factory of all, Argo, was not in existence until 1909, and did not begin to manufacture until the spring of 1910. The factory at Pekin was thoroughly reconstructed at an expense of over $1,000,000 and began operations in 1913. At present the factories of the company consist of Argo, Pekin, Edgewater, and Granite City, the latter a syrup-mixing factory. There is also a reserve not ordinarily operated at Davenport, and there is a relatively small starch-producing factory at Kingsford.

In the case of most of the changes, the result has been a higher producing efficiency and a greater concentration of capacity. Moffett's table of grind, already alluded to, indicates on the whole a steady increase in capacity, at least, after the first two years. The Chicago plant, the government admits, was in no position to be continued, and not only economy, but mere prudence, required its abandonment. I do not believe that the abandonment of the so-called Upper House at Waukegan was with an effort to curtail the grind. This was the old Warner Company plant, and while it was in fair condition in 1906, and was operated through 1913, I believe those witnesses who say that it could not have been rehabilitated to compete on a modern basis at that time without the expenditure of a greater sum of money than was justified economically. The other Waukegan plant, that of the United States Sugar Refining Company, called the Lower House, was only operated one year after the defendants were organized, and the same may be said of it. I find nothing to criticize, therefore, in the abandonment of these plants. The testimony of the letters indicates pretty well that after the first two years the policy of the company had never been toward a restriction of its own grind.

Bedford was actuated throughout with a passion for an increase in size. He seems to have inherited this from his experience with the Standard Oil Company, and to have supposed that only through constantly forcing his production could he obtain that domination which he wished. I believe that he thoroughly understood that any efforts to curtail production and raise prices would be the best means of inducing new capital into the field, and this was the one thing above all others which he wished to avoid. He no doubt knew that, in an industry which enjoyed no legal or natural monopoly, control, in any event, could exist only within narrow limits, and profits could be obtained over a narrow margin. The government, which rightly relies upon the naïve interchange of ideas between the defendants to show their purposes, must be content to accept what makes for them with what makes against, and no one can read this correspondence without observing that there is no desire at any time to limit the grind of the defendants. This seems to me the surest proof that any change of factory equipment was throughout with an eye to manufacturing advantage. Nor can I regard the apparent decrease of capacity dating from 1902 as more than a paper index of actual power. A large number of factories located as chance competition might have dictated might well have an apparent capacity which could not be made real. How far they would have been expanded and modernized, had there been no combinations, it is hard to say. The law of increasing returns operates in the industry up to a grind of 10,000, perhaps up to 15,000, bushels by the unanimous testimony, and many of the old plants had less. Location, especially relative location, must have counted for a great deal, especially when the question was of investing enough more money in a plant, even a large one, to bring its efficiency to modern standards.

I find that the abandonment of the plants since 1906 was without any purpose of limiting production or raising prices.

234 F.—64

XIV. Findings upon the Articles Alleged in the Petition.

It remains to take up the allegations of the petition as they are set forth in separate articles and to make specific findings in relation to them.

I, II, III. The first three articles of the petition are conceded.

IV. The fourth article is not disputed, except so far as the purposes of the defendants are alleged. I find that the reorganizations of 1897, 1902, and 1906 were for the purpose of monopolizing and restraining trade in the manufacture of glucose and starch.

V. I find that the defendants have attempted and are attempting to monopolize the trade in mixed syrups, consisting of from 85 per cent. to 90 per cent. glucose and the balance flavoring matter.

VI. I find that the defendants have attempted, and are attempting, to monopolize the trade in glucose and starch and derivatives therefrom.

VIIa. I find that the consolidations set forth in the petition were made for the purpose of restraining competition in domestic and foreign commerce in starch and glucose and their derivatives.

VIIb. I find that the dismantling of the plants by the defendants was not for the purpose of monopolizing or restraining trade.

VIIc. I find that in two instances before mentioned the defendants exacted contracts not to engage in the trade from the owners who sold their plants, and that this was done with the purpose of monopolizing the industry as aforesaid.

VIId. I find that the defendants from November, 1906, until January 1, 1910, engaged in a profit-sharing plan as alleged, and that this was part of an attempt to monopolize and restrain commerce as aforesaid.

VIIe. I find that the defendants guaranteed their prices against decline in many instances, but I make no finding as to the purpose with which this was done.

VIIf. I find that the defendants attempted by threats to prevent the erection of the American Maize Products Company, and that they subsequently succeeded in restricting the grind of that company by agreement; that in addition they secretly and deceitfully sold at unprofitable prices a part of the product of that company, representing that it came from outside producers, when in fact it was owned by them. I find that both these devices were with the purpose of monopolizing and restraining commerce as aforesaid.

VIIg. I find that the defendants attempted to restrict the grind of the Clinton Sugar Refining Company, and instituted a competition in candy at less than cost, for the purpose of impeding the business of that company, and of securing to itself the custom of candy manufacturers, and that this was done with the same monopolistic intent as above stated.

VIIh. I find that during the years 1910 and 1911 the defendants, having control of the prices at which glucose and starch could be manufactured, lowered prices to a sum less than a fair profit, for the purpose of securing the trade to themselves, and harassing, annoying, and, if possible, driving out their competitors, and that this was done with the same monopolistic intent. I also find that they have since

1909 endeavored to secure to themselves by low prices as much as possible of the trade in mixed syrup of the kind described in article fifth of the petition, and that this was done with monopolistic intent.

VIIi. I decline to find that the defendants fixed any resale prices.

VIIj. I find that the defendants have not used their switching roads since 1906 as a covert means of obtaining rebates.

## XV. THE LAW.

Before the cases of U. S. v. Standard Oil Co., 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, and U. S. v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, it had no doubt been an open question whether the Sherman Act did not forbid all combinations which resulted in terminating a competition theretofore existing, regardless of the effect of that termination upon the industry at large. Those cases must be understood to decide that the effect upon the industry is a factor in determining the illegality of the combination, and perhaps it is yet an open question whether or not the test is to be found only in the combination of enough producing capacity to control supply and fix prices, at least until new capital be induced into the field, or whether it must also be shown that the combination has injured the public in the exercise of that power. The opinions of the Supreme Court certainly seem to indicate that it is the power and not its exercise which is the test. U. S. v. Standard Oil Co., supra; U. S. v. American Tobacco Co., supra; U. S. v. Union Pac. R. R. Co., 226 U. S. 61, 88, 33 Sup. Ct. 53, 57 L. Ed. 124; Standard Sanitary Mfg. Co. v. U. S., 226 U. S. 20, 49, 33 Sup. Ct. 9, 57 L. Ed. 107; Eastern States Retail Lumber Dealers' Association, 234 U. S. 600, 613, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; International Harvester Co. v. Missouri, 234 U. S. 199, 209, 34 Sup. Ct. 859, 58 L. Ed. 1276, 52 L. R. A. (N. S.) 525. This was certainly the opinion before U. S. v. Standard Oil Co., supra; U. S. v. Joint Traffic Association, 171 U. S. 505, 575, 19 Sup. Ct. 25, 43 L. Ed. 259.

Yet it is quite true that the court has also at times spoken in terms which leave it open to argument whether or not it was the public injury done by the combination which makes it illegal. Such is the often-quoted passage in Mr. Justice Holmes' opinion in Nash v. U. S., 229 U. S. 373, 376, 33 Sup. Ct. 780, 781 (57 L. Ed. 1232), that only such "combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition." There are also passages in the opinion in U. S. v. Standard Oil Co., supra, which lend themselves to such an interpretation. It must be conceded that the lower courts are not in entire agreement upon the question (U. S. v. International Harvester Co. [D. C.] 214 Fed. 987), and that the Supreme Court at this time has ordered a reargument of that very case. Yet even the expressions relied upon in these opinions are open to a construction entirely consonant with the rule which makes power only and not the manner of its exercise the test of legality. We have only to assume that all "undue" restraints prejudice the public interest, even though the apparent results are economically benignant to reconcile both forms of expression. Such language might, it is true, cover only distinct economic injuries. A national policy would be intelligible which

looked only at the price and service to the consumer, disregarding the misfortunes of the producer altogether. Yet even then the consumer's interest in the long run is quite different from an immediate fall in prices, even if the quality of the service is maintained. The very defendants allege that a trade war is bad in the end for consumers, and no doubt they are right. If, therefore, "public prejudice" be the test, it by no means follows that it is to be judged alone by price and quality. A given organization of industry may be thought to react to the public prejudice, regardless of its directly observable results.

If the decisions of the Supreme Court are to be so understood, it is the mere possession of an economic power, acquired by some form of combination, and capable, by its own variation in production, of changing and controlling price, that is illegal. It is not necessary in any view that the combination should exclude, or be able to exclude, all others; it is not necessary that its control should extend beyond such a period as is required to bring in new supply. U. S. v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325. If these were necessary conditions, there could, indeed, be no restraint of trade without patent or control of some natural source. Under such an interpretation of the act, Corn Products Refining Company is certainly a combination in restraint of trade, and its excuse is irrelevant, if it were true, that it has had a beneficent effect upon the industry. If the statute condemns an industrial integration of producing units sufficient to fix prices, so long as the total producing capacity remains unchanged, that policy must be respected and enforced, whether it is a good one or a bad.

If, however, it shall be eventually decided that it is the exercise of the power, as so defined, and not the power alone, which is illegal, the case at bar is in the end no different. Under that theory the injuries to the public are shown by the means which the combination has employed in its efforts either to gain or to maintain its position. The means forbidden have been evolved, often empirically, because of a slow recognition that they make for the disorganization of industry and of the depression of a competing producing capacity which, if let alone could compete upon even terms. While the statute under this theory relies upon competition as a proper stimulus to the maintenance of industrial advance and as the chief protection to the consumer, it takes a long view, not a short. It recognizes that with the customer in the end must lie the decision between producers, and that those who fail to secure the market by the quality and cost of their service must pass out of the field; but it does not identify permanent capacity with the inability to endure a transitory or local appeal to customers. Its presupposition is that there may well be competitors capable in the end of giving a service which will serve the public as well as their neighbors, who may yet succumb to concerted competition apparently more serviceable, but only because it is temporary, and is put forward with no purpose of universal application. Possibly it would be hazardous to attempt an absolutely general statement, but it would yet be true to say that nearly all the devices condemned by the courts contain this sporadic element, either of time or place; that is to say, that they cover only a competition which was not intended to be permanent, and which the combination knew was only for the temporary

purpose of extirpating a competitor who had at least some chance in the long run of establishing a service which would be as acceptable as any within the power of the combination itself.

It is on this account that the intent of the combination so often appears in the cases as the determining factor in illegality. It is not because unfair competition is a crime, but only because a monopolistic intent is the clearest evidence that the competition attempted is shown to be temporary and local, and that there is on this account a reasonable expectation that it will be succeeded by competition which the newcomer might well be able to meet, had his development been all the while left unimpeded. If that temporary or local competition were not coupled with such an intent, if there were honest grounds for supposing that it would or could remain to the permanent advantage of the consumer, the public would have no ground to complain, so long as the organization of industry remains on a competitive basis. The intent is the touchstone, not because we are concerned with moral delinquency, but with a test of the probable persistence of the combination's course of conduct. As Mr. Justice Holmes, in Swift v. U. S., 196 U. S. 375, 396, 25 Sup. Ct. 276, 279 (49 L. Ed. 518), says:

"When that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result."

Similarly Mr. Chief Justice White, in U. S. v. Standard Oil Co., 221 U. S. 1, 76, 31 Sup. Ct. 502, 521 (55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), says:

"We think no disinterested mind can survey the period in question without being irresistibly driven to the conclusion that the very genius for commercial development and organization which it would seem was manifested from the beginning soon begot an intent and purpose to exclude others, which was frequently manifested by acts and dealings wholly inconsistent with the theory that they were made with the single conception of advancing the development of business power by usual methods, but which, on the contrary, necessarily involved the intent to drive others from the field and to exclude them from their right to trade, and thus accomplish the mastery which was the end in view."

These expressions mean that where the intent is established to occupy the whole of an industry, and the intent is accompanied by some appropriate conduct, the competition has already ceased in the sense that the national will has directed. Persons actuated with a desire to monopolize the whole of an industry will try—indeed, are already trying--to keep out others, regardless of whether those others can compete efficiently or not. Their conduct constitutes a social evil, because the public is entitled to the free play of such industrial power and capacity as such outsiders may be able to develop.

The Corn Products Refining Company's industrial history has not only been characterized throughout by attempts to create such sporadic competition, but we have the richest possible evidence that they never meant to maintain it as a policy, but only to drive out weaker competitors, so as to maintain the field. The only device which is open to any question in this respect is the low-priced campaign. It might, indeed, be difficult to establish the temporary character of this, were it not, first, for the purposes disclosed in its preparation,

and, second, for the fact that it went too far by the defendant's own statements to admit of continuance. They never meant to keep prices so low, and could not have endured, if they had done so, except by making up through excessive prices on specialties. All their conduct illustrates the kind of competition which tries to prevent the development of newcomers who might permanently secure their own position. I will try to state their position, as I understand it, as sympathetically and as strongly as possible. Their only defense really in the end comes down to the assertion that their efforts to restrict competition failed:

"The statute condemns a monopoly in the sense of a power to exclude others from entering the industry. It has been proved that, whatever our purposes, the field was never closed to competitors. We have continued with only a small absolute increase in grind, if, indeed, we can truly be said to have increased at all, while our competitors, both those who were in the industry when we combined and those who have since appeared, have grown with extraordinary rapidity. We have no natural or legal monopoly upon which we rely; we hold no trade secrets; we have no ability that any one else may not procure. We have never tried to limit our own production; on the contrary, we have flooded every avenue of consumption and opened every new available market, often at great initial expense. We have benefited the consumer by insuring him a sound product at a low price. Nor was our original combination without justification. The industry was engaged in that kind of competition from which the consumer in the end must suffer, since it leads to the destruction of the capital involved. No one could make enough money to keep up his producing capacity, yet all feared to fall behind in sales lest they should be obliterated altogether. Some kind of concerted action alone could save the industry from ruin, and it makes but little difference, as the courts themselves have often said, what form it takes. The critical fact was that some kind of joint action was necessary, and that involved an understanding which, no doubt, must in the end result in some slackening in the ruinous race of overproduction. So much we acknowledge; but we insist that it was a benefit to the industry, and that it finally relieved it from restraint, instead of imposing restraints upon it."

The answer to this is partly on the facts and partly on the law. If the test be that of power alone, it needs no other answer than the opinions already cited at the beginning of this point. If the test be the exercise of the power, the question is of fact. They say that they combined to prevent a ruinous competition, and this is true; but the immediate result of the combination was such a rise in price as attracted new capital into an industry whose producing capacity, on paper, was already more than the market would take. This is good evidence that the price was higher, or the quality worse, than need be. It was no public benefit to fix that price at a point where, with ample capacity, new capital came in; or, if it be said that the old plants were too inefficient to compete, it was no public benefit to combine old plants, now called junk by the defendants themselves, so as to preserve them from their own mutual destruction.

As to their conduct toward subsequent competitors, in their failure they forget their repeated efforts to eliminate all newcomers or to suppress the production of those already in. No one can, in fact, tell how far they have succeeded in discouraging the first, or in depressing the expansion of the second. Under a competition free from such practices, inherent weaknesses of their own might have been discovered; they might themselves have been eliminated. Elimination of some was perhaps necessary; much waste is certainly the

price of a competitive organization of industry. The national will has not declared against elimination of competitors when they fail from their inherent industrial weakness. On the contrary, it has declared with great emphasis against any methods by which such weaknesses might be concealed; in so doing it has assumed a positive purpose toward industry, has established a norm to which competition must conform. This purpose the Corn Products Refining Company has persistently and ingeniously endeavored to thwart from the outset. Its constant effort has been to prevent competitors from that test which would in the long run discover whether they could manufacture as well and as cheaply as itself. It has tried throughout, by its power temporarily to affect commercial conditions, so to obscure the actual industrial facts as to make impossible any test of relative strength. That it has failed does not change the past or make its continued existence in any sense less compromising to the future. There is every assurance that it will continue unfair trade methods, unless it be forcibly prevented. I therefore find that it is an illegal combination.

## XVI. THE REMEDIES.

By far the most important question in the case is whether the remedies which the government shall have shall be limited to an injunction, or whether they should include a dissolution of the Corn Products Refining Company into four or five constituent parts. That there should be an injunction admits of no question. Some of the unfair practices have undoubtedly been stopped; some ceased long before the petition was filed, and there is indeed no reason to suppose that they will again be resumed; but defendants are in no position to complain against a decree of court specifically forbidding them from any resumption of practices which were merely the incidental manifestations from time to time of a purpose which actuated them throughout their whole progress. The injunction will cover in detail the specific matters already considered, such as profit-sharing, a low-price campaign, bogus independents, price agreements, attempts in any way to prevent the entry of others into the industry, or to secure agreements to restrict competition from those already in, and such other details as shall be appropriate.

The question of dissolution turns upon different considerations. As has already been said, if power alone be forbidden by the statute, it can make no difference whether its results are beneficent or sinister, whether a dissolution will affect the industry to its prejudice or to its advantage, whether it will promote or depress foreign trade. So much is indeed implied in the opinions in those cases already cited in point XV. Such questions concern the wisdom of the act, and with it I have nothing to do if once its purpose be authoritatively declared.

If, on the other hand, the exercise of the power is what the statute touches, then the question arises What is practically necessary to prevent the repetition of those unfair means? The defendants' solicitude against dissolution seems to me to be significant in this connection. It is conceded that each of their units is as large as the law of increasing returns demands, and there is no apparent reason why they should fear dissolution if they mean to adopt that kind of competi-

tion which the law contemplates. In order to test the injury which they anticipate, and their good faith in opposing dissolution, it is fair, therefore, to consider their objections in detail.

[3] The chief ground is that dissolution would have an immediate and disastrous effect upon the foreign trade. The argument is as follows: At the present time Edgewater sends two-thirds of its product to Europe, and in so doing has spent large sums of money in opening up many currents of foreign trade. If the combination were divided into competing units, Edgewater at times could find a more profitable individual market by competition along the Eastern seaboard, working out so far to the West as freight differentials allowed. At periods, for example, when Argentine corn can be imported into the port of New York, the local advantage of Edgewater becomes high. If it were a separate plant, whose policy was dictated alone by the interests of its stockholders, in those periods it would compete effectively with the Western plants and would diminish its foreign trade. At present, at such periods it continues its export business, relying upon the Western plants to supply that portion of the demand which it would itself supply if it were acting alone. It is true that there would remain sporadic periods when it would export, times of "dumping," but the development of a sustained foreign export trade would be impossible, once Edgewater were divorced from the combination as a whole. As it is, that plant is pressed to maintain its position against foreign manufacturers having themselves access to Argentine corn. If it could find a ready local market of its own, it would inevitably seize that.

The argument comes to this: That in times of cheap Argentine corn Edgewater does not use its advantage to sell to the Atlantic seaboard (Bedford, indeed, says that it could at times show a profit in Chicago), but uses that advantage for foreign trade. The question really is whether the local consumer should be deprived of that advantage for the sake of maintaining foreign trade, and that depends upon what the relative valuation of the two advantages should be. I cannot think that a court is competent to determine such a preference; it depends rather upon questions of national policy, the indirect benefits of foreign trade, which can be dealt with only where each interest is effectively represented. Certainly I have no means of saying that the commercial advantage of cheap Argentine corn ought to be enjoyed by the manufacturers here, or the foreign consumer, as against the eastern American consumer. It is indeed easy to see that this would be a compelling motive urging competitors of the Corn Products Refining Company to join in opposing any dissolution, but their interest in this respect is not necessarily coincident with that of the general public and their opinion is inevitably interested.

It is quite true that dissolution might result in an overproduction within the United States, and so in the end in the elimination of some of the producing units; but this again is the same problem in another form. It means that because of the present unitary control of Edgewater and the other Corn Products Refining Company plants, in periods when there is a differential favoring Edgewater, that differential is used for the benefit of export trade, rather than to throw out

that part of the Western supply which because of its higher cost could not be marketed in the East. I am not aware of any obvious and compelling policy which makes it advisable to favor a more expensive manufacture in the West, with its necessary higher prices to the consumer, for the sake of foreign trade. The decision of such questions certainly should not rest with the producers themselves, nor, as I have said, is it a proper matter for courts. The foreign trade of the competitors of the Corn Products Refining Company has so far been of a trifling character. In 1912 it represented less than 8,000,-000 pounds of glucose out of a total of 278,000,000, and of starch less than 700,000 out of a total 2,000,000. The question really seems to concern, therefore, only the export trade of Edgewater itself. I shall therefore lay from consideration this feature of the evidence.

[4] The next objection is that a dissolution will involve the expenditure of large sums of money to readapt the several plants to stand upon a self-subsisting basis. Argo is the largest of all, but is especially adapted to manufacture the specialties, so called—dextrines, gums, grape sugar, and syrup. It must either discontinue some of its manufacture of specialties or put in more bulk-producing capacity. The reason for this is said to be that in selling it must be possible to supplement the specialties with bulk supply in order to hold customers. No plant could undertake to sell specialties alone, though it manufactured itself all the glucose and starch which went into them. Pekin is at present a starch plant altogether, though it has a glucose refinery of 12,000 bushels out of a total capacity of 30,000; it would have to develop a more diversified business if it were to sell alone. Granite City is a syrup-mixing plant, making its own glucose; it might succeed in its own territory, but the matter is problematical. Davenport is only a reserve plant, not usually operated, and somewhat antiquated as well. It would not make an economical unit.

I do not doubt that a dissolution in the case would operate to the disadvantage of the total production, and that it would require readjustment of the plan of manufacture of each plant; but there is nothing in this evidence which indicates any serious demoralization of the industry at large. Argo could certainly maintain its grind, even if part of the glucose and starch were sold as bulk products. The result would be to leave unemployed so much of its capacity for making end products as now rely upon the bulk capacity of Pekin and Granite City. In so far it would injure the usefulness of that much of the capital already invested. Pekin may have been used as a bulk starch house, but with so large a glucose capacity it cannot be said to be a specialized plant. Indeed, there are, as it is, plants which do nothing but a starch business, e. g., Douglas, Huron, Staley, Piel, and Keever, which have never done anything else, just as there are plants which have made nothing but glucose, as the Clinton Company. The only competitors which have made both starch and glucose between 1906 and 1914 are Hubinger, Union Company, and the American Maize Products Company. Similarly, the Granite City plant need not make starch; possibly it might have to sell part of its glucose unmixed, but that, as in the case of Argo, would only make less useful so much of its finishing plant as could not be employed. Davenport

seems to me to have a questionable value as it is; it is not generally operated at all, and is run as a reserve. A question might arise as to the propriety of allowing its union with Pekin or Granite City, if need were.

None of these considerations seem to me sufficient to prevail over the wisdom of disintegrating a combination which has shown such an inveterate and incorrigible insistence upon interfering with the course of commerce which the law demands. That the general organization of the Corn Products Refining Company would be disrupted would, of course, follow; it is, indeed, the very purpose of the relief itself. The suit is, it is true, not punitive in its character; but the stockholders are in such cases responsible for the conduct of the business by the officers in charge. Such loss as is involved in removing from their hands the power which they have so persistently used contrary to law is an inevitable, though unfortunate, incident in the enforcement of the statute.

In all cases where the history of the combination has been such as this, the Supreme Court has declined to rest upon injunctions alone. The difficulties of proof, the delay, the cumbersome inquiry necessary to ascertain again whether the defendants shall have actually discontinued, all make against such a limitation. It may be safely assumed that evidence such as was by chance available here of the actual purposes of those in charge will never again exist. Without it, perhaps, it is doubtful whether the case could have been proved. Yet it is a reasonable assurance to take that, when an innate proclivity has so abundantly manifested itself over a period of years, it shall be disabled from further opportunity. No case, it seems to me, could more require such a remedy, unless injunctions are to serve for the only remedy. It is clear enough that, had dissolution been decreed in 1906, no court would have allowed any units so large as the present Corn Products Refining Company. The precise form of redistribution will have to come up later, but a combination of 60 per cent. of the whole industry would not have been considered.

The form of the decree as concerns dissolution will in general follow that in the case of U. S. v. International Harvester Company, except that the time within which to file a plan will be 120 days, instead of 90, and that the plan will be filed with the Federal Trade Commission as master in chancery, under section seven of the Federal Trade Commission Act. That commission will in due course present a plan for dissolution, which will come on for confirmation to the District Court as the report of any master in chancery.

## XVII.

I see no reason to exempt from the injunction the defendants Speyer, Boardman, Kelsey, and Nichols. They were all directors for three years before petition filed, and must be supposed to be privy to the general plans of the company. If they wish, they may be excluded from such parts of the decree as cover any trade practices which terminated before January 1, 1910.

The final decree may be settled upon five days' notice to the defendants.